**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Larry JONES and Douglas Nisbet,**
**Defendants-Appellants.**

**Nos. 81–2941, 81–2952.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1982.

Decided Dec. 14, 1982.

Rehearings and Rehearings En Banc
Denied Jan. 21 and March 9, 1983.

William A. Kerr, Loren J. Comstock, Indianapolis, Ind., for defendants-appellants.

Paula E. Lopossa, Asst. U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before BAUER and CUDAHY, Circuit Judges, and WEICK,* Senior Circuit Judge.

BAUER, Circuit Judge.

Defendants Larry Jones and Douglas Nisbet [1] were convicted of conspiracy to possess cocaine with intent to distribute, and of possession of cocaine with intent to distribute. Nisbet also was convicted for assaulting federal officers engaged in performance of their duties.

The defendants have alleged as many as two dozen separate errors in the proceedings, including the illegality of their arrests and the room search, the sufficiency of evidence on several issues at trial, evidentiary errors, possible juror prejudice, and faulty jury instructions. Many of these allegations are without merit, and therefore we

---

* The Honorable Paul C. Weick, Senior Judge of the United States Court of Appeals for the Sixth Circuit, is sitting by designation.

1. Appellant Douglas Nisbet's brief before this court had his name spelled "Nesbit." His reply brief, however, had his name spelled "Nisbet." Moreover, the government's answer brief used "Nesbit," although the fugitive and search warrants at issue in this case spell the name "Nisbet." We deem Douglas's own signature of "Nisbet" on a motion before the district court, and his testimony on direct examination, to be the best evidence of the correct spelling of his name, and therefore adopt it in this opinion.

treat them summarily. The remaining alleged errors are discussed below. We affirm.

## I. *Facts*

On July 24, 1981, Special Agent James McGivney of the Federal Drug Enforcement Administration learned from Special Agent Frank Waldrup of Illinois about two outstanding Illinois warrants charging Defendant Douglas Nisbet with unlawful delivery of a controlled substance and failure to appear. In addition, Waldrup said that his informant advised that Nisbet would be in Crawfordsville, Indiana, carrying a large quantity of cocaine. The next day, Agent McGivney received from Agent Waldrup a two-year-old photograph of Nisbet and copies of the unexecuted warrants, which McGivney confirmed through the National Crime Index Computer System. On July 27, Agents McGivney and Waldrup along with an investigative team of ten law enforcement agents and officers from Illinois and Indiana gathered in Bloomington, Indiana to formulate plans to apprehend Nisbet. Two federal agents, King and Casey, immediately traveled to the Holiday Inn at Crawfordsville, where Waldrup's informant said Nisbet would be staying.

The agents arrived at the motel at about noon and saw a man near the swimming pool fitting Nisbet's description. The other agents arrived soon thereafter and watched Nisbet through a motel office window located at least twenty-five feet from the swimming pool. During this time, Agent McGivney discovered through motel registration records that room 150 was registered to "L. Jones" from Sunrise, Florida, for two persons. At about 1:15 p.m., Nisbet left the pool area and eventually went to room 150. Knowing that Nisbet had registered in other hotels under the same name, McGivney immediately placed room 150 under surveillance. At that time, Nisbet and his companion already had been registered in the Holiday Inn for three days.

At 1:30 p.m., Agent McGivney, in cooperation with the motel manager, sent Agent King to room 150 dressed as a bus boy to deliver a large quantity of food which someone in the room had ordered. After the delivery King reported that he saw two men, one matching Nisbet's description, and drug paraphernalia in the room.

The agents continued their surveillance until approximately 3:30 p.m., when Agent King returned to Nisbet's room, ostensibly as a bus boy to retrieve the food trays. This time, although Nisbet met King at the door, King was neither admitted to the room nor given the trays. Again King positively identified Nisbet, and the agents decided to make an arrest based on the Illinois warrants and their informant's representations.

The agents delayed executing the arrests until 5:30 p.m., when they followed Agent King back to Nisbet's room. King announced that he had come to pick up the food trays because he was going off duty. Nisbet opened the door with the food tray in his hands. King announced, "Police!" A struggle ensued; a shotgun was discharged, and Nisbet and Co-defendant Jones were arrested. The two men were hustled from their room, handcuffed, and placed face down on the grass outside the motel. At the same time, Agent McGivney conducted a "protective sweep" of the room, discovering in plain view two plastic bags containing "green vegetable" material, white powder scattered on top of a television, and an open suitcase containing a paper bag filled with packets of a white powder. The suitcase also contained drug paraphernalia.

After the sweep, room 150 was secured while Agent McGivney obtained a search warrant from a United States Magistrate in Indianapolis. A thorough search then netted several packages containing cocaine, scales, and "cutting" agents and equipment.

## II. *Delay before Arrests*

The defendants contend that because the law enforcement agents first observed Nisbet at about noon on July 27, 1981, but waited until 5:30 p.m. to make the arrests in Nisbet's motel room, the sweep of that room was improper. They argue that the one hour or longer surveillance of Nisbet at poolside was time enough to establish Nis-

bet's identity and make an arrest. Further, they suggest that the four-hour delay after Nisbet had secluded himself in his motel room did not assist in identification and was merely a pretext to gain entrance to the room where the agents hoped to find incriminating evidence. Despite its crystal clarity, however, we decline to exercise hindsight to fault the investigators' decision to delay arresting Nisbet simply because the subsequent maneuvering did not significantly aid in identifying the suspect.[2] Only the first hour or so delay before Nisbet left the swimming pool area and went to his room is questionable. After that the defendants cannot complain, because they were in room 150 the entire ensuing four hours.

■ In *United States v. James,* 378 F.2d 88 (6th Cir.1967), heavily relied upon by the defendants, the Sixth Circuit reversed a conviction and remanded with instructions to suppress evidence obtained in an apartment search. There the issue of purposeful police delay arose because the agents had obtained an arrest warrant one or two days before the arrest, but had never secured a search warrant although they fully intended to search the apartment. During that search they found narcotics in a vacuum cleaner in a bedroom closet. That case differs substantially from our defendants' complaint that Agent McGivney should have completed a positive identification check on Nisbet and arrested him at poolside within the short time before he went to his room. The other cases cited by the defendants, *Harris v. United States,* 321 F.2d 739 (6th Cir.1963); *United States v. Weaver,* 384 F.2d 879 (4th Cir.1967), *cert. denied,* 390 U.S. 983, 88 S.Ct. 1106, 19

L.Ed.2d 1282 (1968); and *Williams v. United States,* 418 F.2d 159 (9th Cir.1969), *aff'd,* 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971), among others, also do not persuade us that the delay here was wrongful.[3]

A delay of sixty to ninety minutes to insure against falsely identifying a person, who was seen through a window twenty-five feet away and compared to a two-year-old photograph, cannot constitute the type of delay which violates constitutional rights.[4]

### III.  *Validity of Arrests*

After he had conferred with Illinois Agent Waldrup, Federal Agent McGivney confirmed through the National Crime Index Computer System that Defendant Nisbet was wanted by Illinois law enforcement officials for unlawful delivery of a controlled substance and failure to appear. The government relied upon these warrants and the knowledge that Nisbet was transporting cocaine as probable cause for Nisbet's arrest. Both defendants claim that their arrests were improper.

■ Nisbet argues that McGivney's affidavit submitted to obtain a search warrant after the arrests did not demonstrate that the officers had probable cause for the earlier arrest because the affidavit was conclusory and based upon information from an informant who, Nisbet alleges, was not proved reliable. We disagree. First, as a general proposition, a search warrant cannot always be utilized as a measure of probable cause for an arrest. Although much of the factual information might overlap, probable cause to search differs from probable cause to arrest. Therefore, an affida-

---

2. For that matter, we believe that Agent King's two visits to room 150 were helpful. A face-to-face confrontation with a suspect is more reliable than surreptitious peering through a window 25 feet away. The four-hour delay after Nisbet went to his room and before he was arrested suggests careful police investigation rather than underhanded delay. In fact, the delay could have worked to the agents' disadvantage. During that time Nisbet and Jones might have disposed of the drugs by flushing them away or ingesting them, and camouflaged the paraphernalia.

3. In fact, *Williams* approved a 1¾-hours search of the defendant's residence after police waited six hours for him to return.

4. Notably, all of the cases cited by the defendants involved carefully conducted exploratory searches for evidence. Agent McGivney, on the other hand, made only a 90-second or less "protective sweep" of the motel room to be certain that it was secure against any risks to the law enforcement agents.

vit may support the issuance of a search warrant without stating adequate grounds for an arrest. Moreover, this court will not invalidate an arrest merely because a subsequent affidavit does not demonstrate probable cause. The crucial determination is whether the agents actually had probable cause at the time of arrest. *United States v. Fernandez-Guzman,* 577 F.2d 1093, 1098 (7th Cir.), *cert. denied,* 439 U.S. 954, 99 S.Ct. 351, 58 L.Ed.2d 345 (1978). We find that the agents here had probable cause to arrest Nisbet, based on their confirmed knowledge that he was being sought for two crimes and their information from that informant.

■ Second, we are convinced that the affidavit for a search warrant did illustrate probable cause for Nisbet's arrest.[5] The information contained in the affidavit was factual, not conclusory. Agent McGivney relied on Agent Waldrup's representations as to the informant's reliability and veracity. We cannot fault that reliance.[6] Thus, the agents' reliance upon the knowledge that Nisbet would be in Crawfordsville with cocaine was proper. *See, e.g., United States v. Scott,* 545 F.2d 38, 40 (8th Cir. 1976), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 784 (1977). In addition, the existence of outstanding warrants, confirmed through computer records, is authority for an arrest.

Defendant Jones contends that his arrest likewise was executed without probable cause. He argues that the agents arrested him before they had any grounds to do so, and that the subsequent sweep of the room which revealed drug paraphernalia could not be used to justify his arrest, regardless of the validity of that sweep.

In *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the

---

5. The affidavit read, in part:

Your affiant is a Special Agent of the Federal Drug Enforcement Administration and has been so employed for approximately 10 years.

1. That the information contained in the following numbered paragraphs below is personally known to your affiant or has been personally told to your affiant by the individuals named in the numbered paragraphs below.

2. That on Thursday, July 24, 1981, your affiant was personally advised by a police officer known to him that the police officer had told him that an informant told the police officer of the activities of an individual identified by the informant as Douglas NISBET, a fugitive from justice.

3. That your affiant was personally told by the police officer that the informant had provided information to him and other police officers on at least three occasions in the past and that this information concerning criminal activities of persons had been independently corroborated by the police officer and other police officers.

4. That your affiant was personally told by the police officer that the informant personally told the police officer that Douglas NISBET was wanted on criminal charges in the State of Illinois and that NISBET was a fugitive from the State of Illinois and using an assumed name.

5. That your affiant was personally told by the police officer that the police officer had personal knowledge of NISBET's fugitive status and pending charges in the State of Illinois.

6. That your affiant personally verified that NISBET was wanted on criminal charges in the State of Illinois through a check with the National Crime Information Center (NCIC) which revealed one Douglas NISBET to be listed on the following charges and warrants: A) Unlawful Delivery of a Controlled Substance and Failure to Appear, Warrant # 78CF867, Champagne [sic] County, Illinois, dated 5/22/79, and B) Fleeing and Attempting to Elude the Police and Failure to Appear, Warrant # 79T1057, dated 5/30/79 from Douglas County, Illinois. That your affiant personally observed copies of the aforementioned warrants and copies of the warrants are marked Exhibits A and B, and that by reference incorporated herein, as attached.

7. That your affiant was personally told by the police officer that a confidential informant advised him that NISBET would be in the area of Crawfordsville, Indiana, during the period 7/26/81 through 7/28/81.

6. Following the lead of the Supreme Court in *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), many lower courts have held consistently that another law enforcement officer is a reliable source of information to establish probable cause. *See generally* 1 W. LaFave, Search and Seizure § 3.5, at 619–21 (1978). Reliability seems especially clear in this case where Agent Waldrup, the officer upon whom McGivney relied, stated sufficient grounds to establish the reliability of his informant.

Supreme Court discussed its long-held view that certain seizures, despite implicating Fourth Amendment protection, constitute such limited intrusions on the rights of the persons detained and are justified by such substantial state interests that they may be made on a standard less than probable cause. *Id.* at 699, 101 S.Ct. at 2592. As noted in *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968), "the central inquiry under the Fourth Amendment" is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."

█ Here, the agents had probable cause for Nisbet's arrest. When they entered room 150 they immediately confronted a second person—Jones—who they already knew was in the room. The agents also knew, from Agent King's earlier entry into the room, that the room was littered with drug paraphernalia and substances resembling drugs. In addition, room 150 was registered to "L. Jones." It would have been absurd for Agent McGivney to have taken Nisbet out of the room while ignoring Jones. Instead, Jones was detained. If the information supplied by Agent King at 3:30 p.m. was not enough in itself to constitute probable cause to arrest Jones, the information gleaned by McGivney in his rapid sweep of the motel rooms certainly erased any doubt about the officers' right to make the arrest. Probable cause requires facts and circumstances sufficient to convince a prudent person that the suspect had committed or was committing a crime. *Gerstein v. Pugh,* 420 U.S. 103, 111–12, 95 S.Ct. 854, 861–862, 43 L.Ed.2d 54 (1975). That standard was satisfied.

### IV. *Validity of Search*

█ The defendants next argue that the law enforcement agents were required to obtain a search warrant before entering the motel room to make the arrests. Because there was no search warrant, the defendants contend that all of the evidence seized during both the "protective sweep" and the full-blown search should be suppressed. The Supreme Court, however, twice has expressly declined to require such a procedure under the Fourth Amendment. *Steagald v. United States,* 451 U.S. 204, 221, 101 S.Ct. 1642, 1652, 68 L.Ed.2d 38 (1981); *Payton v. New York,* 445 U.S. 573, 602–03, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980). The *Payton* Court considered whether police could enter a suspect's dwelling to effect an arrest without either an arrest warrant or a search warrant. The Court concluded that warrantless, nonconsensual entry to make a routine felony arrest violates the Fourth Amendment. The Court refused to require a *search* warrant, however, holding that an arrest warrant sufficed.

█ An intrusion into a personal residence to make an arrest implicates two constitutional interests: the right to be free from an unreasonable seizure, and the right to be free from an unreasonable search of the residence. *See Steagald v. United States,* 451 U.S. at 215–16, 101 S.Ct. at 1649. When the suspect is in his own home, a determination of probable cause to arrest that suspect made by a detached magistrate is a sufficient shield from unreasonable searches. The *Payton* Court emphasized this, stating:

> It is true that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.

*Payton v. New York,* 445 U.S. at 602–03, 100 S.Ct. at 1388. The defendants here shared the motel room registered to Defendant Jones. Although the constitutional protections against unreasonable searches and seizures extend generally to guests in

motel rooms, *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964), those protections were not threatened because the agents relied upon existing arrest warrants when they approached room 150.[7]

The defendants also argue that the law enforcement agents should have obtained a telephonic search warrant pursuant to Federal Rule of Criminal Procedure 41(c)(2).[8] We cannot agree that a search warrant was constitutionally compelled in this case. We doubt that Agent McGivney's actions upon arresting the defendants constituted a search at all.[9] In any case, the protective sweep conducted here certainly was within the boundaries of constitutionally valid searches established in *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–2040, 23 L.Ed.2d 685 (1969), and its progeny. The police may search adjoining rooms to look for possibly dangerous persons. *Warden v. Hayden,* 387 U.S. 294, 299, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967); *United States v. Agapito,* 620 F.2d 324, 335–36 (2d Cir.1980); *United States v. Miller,* 449 F.2d 974, 977–78 (D.C.Cir.1971). *See Chimel,* 395 U.S. at 763 n. 8, 89 S.Ct. at 2040 n. 8 (affirming *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967), which cited *Warden v. Hayden* as one of the exceptions to the search warrant requirements).

In *Miller,* the District of Columbia Circuit affirmed a conviction obtained in part on evidence discovered during a warrantless search of a five-room dentist's office, because the search was necessary to assure

the officers' safety. The same reasoning applies here. The agents did not know who, other than Defendant Nisbet and one other person, was in room 150. Moreover, they had good reason to believe that anyone else who may have been in the room would be hostile to them.

Although we find that a search warrant was not necessary, we are disturbed by the government's "policy" of not obtaining a telephonic search warrant as authorized by Federal Rule of Criminal Procedure 41. *See supra* note 8. The agents had ample time between first sighting Defendant Nisbet and the arrest to telephone a federal magistrate in Indianapolis for a search warrant. Moreover, probable cause to search the motel room existed at least as early as 3:30 p.m., when the agents completed a positive identification of Nisbet. We note also that Agent King reported seeing drug paraphernalia after he entered room 150 at 1:30 p.m. Had the agents secured a telephonic search warrant before arresting Nisbet and Jones, the issues surrounding a warrantless search would have been defeated before they ever arose. That is precisely the desired effect of the rule. Law enforcement agents should be encouraged to seek search warrants by whatever means, whenever possible.

In response to inquiries from this panel, the government's lawyer explained that the office of the United States Attorney in Indiana had a general policy to avoid using telephonic search warrants. This pol-

7. The sequence of events surrounding the arrest also indicates that Defendants Jones's and Nisbet's right to be free from unreasonable searches was not violated. Agent King knocked on the door of room 150 and announced that he was a bus boy. When Nisbet opened the door, King displayed his badge and announced that Nisbet was under arrest. The agents did not enter the room until Nisbet began struggling with them. During the struggle, Nisbet fell back into the room where he was subdued. Then, Jones was discovered and arrested, and Agent McGivney conducted a brief "protective sweep" of the premises.

8. "(A) General Rule. If the circumstances make it reasonable to dispense with a written

affidavit, a Federal magistrate may issue a warrant based upon sworn oral testimony communicated by telephone or other appropriate means." Fed.R.Crim.P. 41(c)(2)(A) (1979).

9. McGivney looked around the single room and the adjoining bathroom during a "search" which in all probability lasted less than 90 seconds. Apparently nothing was discovered except what was in plain view from the moment the agents entered the room, *see Ker v. California,* 374 U.S. 23, 42–43, 83 S.Ct. 1623, 1634–1635, 10 L.Ed.2d 726 (1963); *United States v. Griffin,* 530 F.2d 739, 744 (7th Cir. 1976), and no evidence was seized until after the room was sealed and a proper warrant obtained.

icy contravenes the express purpose of the telephonic search warrant rule.

Even when a search warrant would not be required to enter a place to search for a person, a procedure for obtaining a warrant should be available so that law enforcement officers will be encouraged to resort to the preferred alternative of acquiring "an objective predetermination of probable cause," *Katz v. United States,* 389 U.S. at 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), in this instance, that the person sought is at the place to be searched.

Fed.R.Crim.P. 41(c)(2) advisory committee note (1979). *See also* S.Rep. No. 354, 95th Cong., 1st Sess. 10, *reprinted in* 1977 U.S. Code Cong. & Ad.News 527, 534; *United States v. McEachin,* 670 F.2d 1139 (D.C.Cir. 1981).

## V. Miranda *Warnings*

After Nisbet and Jones were arrested, they were forced to lie down on the lawn outside of the motel room, where they were advised of their rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendants now complain that their subsequent statements were inadmissible because their arrests and the protective sweep were illegal, and because the government failed to show that the defendants understood the warnings. The defendants argue that, because the *Miranda* warnings were given shortly after the shotgun blast during the arrest, they were in a state of shock and could not appreciate the *Miranda* warnings.

■■■■ Initially, we reject the suppression argument that any statements were tainted by illegal activities of the agents, because we hold that the arrests and the searches in this case were not improper.[10] The second contention also is unpersuasive. Agent Casey read the *Miranda* warnings to Nisbet and Jones from a prepared form. Each statement of a right or warning is in the question form "Do you understand ...?" After each question, Casey paused for an answer, which he apparently received. Finally, although a point-blank shotgun blast is very violent, we do not believe that the explosion necessarily meant that the defendants could not appreciate the import of the warnings given to them. The evidence from the agents, the defendants, and the examining physicians does not demonstrate that Nisbet and Jones were so injured that they could not understand what they were told. Therefore, we find that the first set of *Miranda* warnings given outside the motel were adequate to safeguard the defendants' rights.

## VI. *Trial*

The defendants have raised several issues involving the sufficiency of evidence presented by the government and several allegations of improper prosecutorial conduct.

■■■■ First, Defendant Nisbet urges reversal because the government failed to rebut his claim that he was coerced into transporting the narcotics from Florida to Indiana. We need not recite the complicated scenario that Nisbet used in his defense. The government presented an abundance of evidence challenging Nisbet's story that he

---

**10.** Two agents who rode in the ambulance with the defendants when they were taken to and from a hospital in Crawfordsville for examination of any possible injuries exchanged a few words with the defendants during the ambulance rides and at the hospital. All that Jones said was that that day was his daughter's birthday. Nisbet, however, made several remarks implicating him in the criminal activity in response to comments made by one of the agents.

At approximately 9:00 p.m., after the arrests and the hospital visits, the defendants were taken to Indianapolis for processing. Defendant Jones was given a document which reiterated his rights and contained a waiver of rights form which Jones signed. He now argues that the written rights and waiver form is insufficient to constitute an effective waiver of his rights. We reject that argument. The agent asked Jones whether he could read and write and whether he understood what he was reading.

The warnings given outside of the Holiday Inn were sufficient to inform the defendants of their rights to counsel and the possible consequences of speaking without the benefit of a lawyer. The additional rights and waiver form further assured protection of those rights.

was attempting to save his fiancee's life by smuggling cocaine into Indiana. Nisbet's cross-examination alone raises serious doubt about his defense.[11] This court will not disturb a jury's verdict if it is supported by substantial evidence viewed most favorably to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Santiago,* 582 F.2d 1128, 1130 (7th Cir.1978). The defendants have failed to show where the government did not support its burdens of proof.

■ Second, Nisbet argues that the government did not sustain its burden of proof that Nisbet assaulted the federal agents at the motel room doorway. He argues that the trial court itself expressed

hesitancy with the assault verdict at sentencing when the judge commented, "Count 3, the assault—everything happened pretty rapidly at that door. I'm not too excited about that."

Nonetheless, the court sentenced Nisbet to one year of imprisonment on the assault conviction. More importantly, of course, the court denied all of the defendants' motions for relief on any of the jury verdicts. The trial judge's comments at the sentencing hearing bear little weight in the consideration of the sufficiency of the evidence at trial.

Three government witnesses testified repeatedly that Nisbet threw the food tray at Agent King when King announced that he was a police officer.[12] There is no doubt

11. Simply stated, Nisbet claimed that a man held his fiancee captive at gunpoint, ordering Nisbet to either deliver the "white powder" to Indiana in payment of a large gambling debt or be killed. On cross-examination, however, Nisbet admitted that, although he allegedly feared greatly for his fiancee's life, he did not mention the situation to authorities after his arrest. Our review of the trial transcript uncovered other testimony from several witnesses which further, and more deeply, undercut Nisbet's defense. This is not a trial court; the government surpassed its burden of presenting evidence to withstand our standard of review. *United States v. Castenada,* 555 F.2d 605 (7th Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977).

12. Several government witnesses testified to the events which occurred when Nisbet opened the door to room 150 at 5:30 p.m. Agent King, the agent who dressed as a bus boy when Nisbet was arrested, testified:

Q Did you return, then, at 5:30 p.m. that afternoon?
A Yes, ma'am.
Q What happened at that time?
A At 5:30 I went back to the room accompanied by other agents and officers. I knocked upon the door. The door was opened again slightly by Mr. Nisbet. I asked Mr. Nisbet once again for the food service refuse and garbage. Mr. Nisbet once again said that he was not finished with it. I explained to him that I was getting off the shift in just a few minutes and that I would like to retrieve the garbage, especially the large tray. Mr. Nisbet agreed. He shut the door at that point.

Approximately one minute later he came back to the door carrying a big tray with several items on top of it. As he opened the

door my first words were, "Police. You're under arrest." The tray came over the top of myself. Agent McGivney was to my immediate left in the doorway at this point. The tray struck me on the left arm, knocked me against the right door jamb. A shotgun Mr. McGivney was carrying discharged. There was a large amount of shrimp cocktail splattered on my clothing and across my face. I then, after being knocked to the side of the door, sort of regained my composure and entered the room at that point.
Tr. at 370–71. Agent Casey testified on direct examination:
Q When you came around the building behind McGivney, what did you see or what happened?
A Special Agent McGiveny went to the left of the door, to the left of Special Agent King, and I went right behind Special Agent King. As this all happened in a very few seconds, I observed Defendant Nisbet. He had a tray in his hand, and he threw the tray forward, and I saw a red substance flying through the air and I heard some dishes clattering. . . .
Tr. at 399–400. On direct examination, Agent McGivney, the agent in charge, testified:
Q At about 5:30 when you effected the arrest, would you tell the jury what occurred.
A Yes, ma'am. At 5:30—Special Agent King and I had previously agreed that we would knock on the door of room 150 in an attempt to have the occupants, Mr. Nisbet and Mr. Jones, open the door. At that time Mr. King knocked on the door, and I was in the position behind an overhanging brick wall on the left side of Mr. King where I couldn't be seen by the people in the doorway. At that time Mr. King knocked on the door and I heard the door open. I heard Mr. King ask if he could have the room service

that the government's evidence qualifies as "substantial" on the assault charge.

■ We note that reversal on the grounds of insufficient evidence is proper only when the prosecution's failure to sustain its burden is clear. *Burks v. United States*, 437 U.S. 1, 16–17, 98 S.Ct. 2141, 2149–2150, 57 L.Ed.2d 1 (1978). Additional-

tray as he was going off shift and needed to turn it back to the kitchen. I heard the door close. Short time later I heard the door open, and at the same time I swung around the corner of the wall and faced the door. Simultaneously Special Agent King identified himself as a police officer and told Mr. Nisbet he was under arrest.

Mr. Nisbet was standing inside the doorway, had a large tray with some dishes and dinnerware on it. At that time he flipped the tray, the contents of the tray, toward Special Agent King and myself and swung the tray towards me. Special Agent King and I were both hit with some of the dishes. I observed Special Agent King go backwards and sort of lose his balance or go down against the door jamb. At the same time I stepped in with the shotgun and parried the blow of the tray. When I did that, the shotgun went off.

Tr. at 281–82. On cross-examination, McGivney testified:

Q Isn't it a fact, Agent McGivney, that when you came in the room you had your shotgun in a carrier position and brought it upward; isn't that a fact? You raised the shotgun, the barrel upwards?

A As I came in, as I remember it, sir, I had the shotgun in a port arms position and pushed it out in that manner.

Q And when you pushed it out in that manner, it came in contact with the tray, did it not?

A The tray was being swung towards me at that time.

Q But the shotgun came in contact with the tray?

A Yes, it did.

Q The hole in the tray was a result of the shotgun going off?

A Yes, sir.

Q But you actually moved the shotgun into the tray?

A The tray was being swung toward me, and I parried the tray with the shotgun.

Tr. at 320–21. And finally, Agent McGivney testified on redirect examination:

Q And yesterday you also testified with regard to how the tray and—how your shotgun discharged. Would you reiterate how that occurred.

A Yes, ma'am. As I stepped around to the open door of 150 after Agent King had identified himself as a police officer—at the same time as Agent King had identified himself as

ly, neither the trial court nor this court should invade the jury's province by assessing the credibility of witnesses on a motion for acquittal or reversal based on insufficient evidence. *United States v. Ford*, 324 F.2d 950, 952 (7th Cir.1963).

■ Nisbet's other sufficiency of evidence arguments are less meritorious.[13]

a police officer, stepped into the doorway, Mr. Nisbet tossed the contents of the tray towards us. There was different eating utensils on it, dishes. There was a bowl of shrimp cocktail sauce. And at the same time swung the tray towards me, and I took the shotgun, which I had at what we would call port arms, and put it in a bayonet-type position to block the tray.

Tr. at 355–56.

Defendant Nisbet countered the government's case on direct examination, testifying:

Q Now, at the time will you tell me as to the best of your recollection exactly what happened from the time the agents came to the room until you were taken away from the area. Can you go through that and tell the jury and Judge what happened.

    \*     \*     \*     \*     \*     \*

A There was a knock on the door. I went to the door, opened it. A man dressed as a bus boy was at the door and asked me for a tray. I told him I was not done with the tray. He said he was going off shift and they were out of trays, he had to have the tray. I said, "Just a minute," closed the door. I went back, cleared the tray of any food. When I went back to the door, I held the tray in my hands, put it against the door frame and against my stomach, reached over, let go of the tray with one hand, opened the door, cracked the door open, grabbed back ahold of the tray on my side, stepped back, stood on one foot to open the door with my foot—and the door was forced open, I was knocked backwards. When I went backwards, the tray went up and over. The next thing I saw was a gun in my face.

Q All right. Now, at any time did you swing the tray towards or at either Agent McGivney or Agent King?

A Absolutely not.

Q Do you know why the tray went up and over? What caused it to do that? What did you see?

A The door hit the tray when it was forced open from the outside after I had cracked the door.

Tr. at 550–51.

**13.** Nisbet also complains about several answers given by government witnesses, alleging that the answers so prejudiced the jury that Nisbet could not have received a fair trial.

Similarly, we find that Defendant Jones's argument that the government did not prove that he possessed and intended to distribute drugs is not persuasive. The facts shown at trial on those issues go far beyond the cases cited by Jones showing that mere presence is insufficient to convict. Once again, the trial judge's comments at sentencing[14] do not sway our position.

## VII. *Jury*

During *voir dire,* the following colloquy took place between the trial judge and a prospective juror:

> JUDGE: And now, getting back to you Mr. Brooks .... If you were selected as a juror ... could [you] arrive at your verdict based solely on the facts as you find them ...?
>
> *       *       *       *       *       *
>
> JUROR: No.
>
> *       *       *       *       *       *

The most serious allegation goes as follows: At trial, Agent King was asked how he processed Defendant Nisbet. He responded, in part:

> The last thing that is usually accomplished in the processing is that the Drug Enforcement Administration has a rights form, which is a paragraph that sets out the defendant's constitutional rights under the *Miranda* ruling. I read that to Mr. Nisbet. There is a subparagraph under that form that is headed by the word "Waiver." If the individual wishes to waive his rights and make a statement to the agents or officers at that point, they're asked to sign that. I read that to Mr. Nisbet and asked him to sign and he refused to sign it....

Tr. at 379. Nisbet's lawyer immediately moved for a mistrial. They claim now that the mention of Nisbet's refusal to sign a waiver form "clearly focused" on Nisbet's *prior* criminal activity and his right to remain silent. There is no doubt that King should not have mentioned the waiver form in his testimony. However, the testimony is not so damaging as to require reversal.

In fact, as the trial court recognized, that answer along with another answer from King more likely implicates only the assault charge being tried, not earlier charges which arose in 1979. Moreover, the court carefully instructed the jury to disregard the refusal to sign the waiver because such a refusal is an exercise of a constitutionally protected right.

> JUROR: I am not saying that I exactly believe what the newspaper reporter put in the paper, but what's involved here I am definitely against and I—
>
> JUDGE: Now, Mr. Brooks, whoa. I didn't ask you to make a speech....

Tr. at 237–38. Minutes later another juror responded to a question regarding his thoughts on a defendant's right to refuse to testify, saying:

> JUROR: I agree. They shouldn't be made to testify against themselves, but I feel, if they have nothing to hide, that—so in that case it may sway me.

Tr. at 251.

Without citing a rule, statute, or case in support of their argument, both defendants claim these incidents violated their right of confrontation and right to an impartial jury because the judge did not dismiss the entire jury panel which heard the remarks.[15] Defendant Nisbet also maintains that he could not have received an impartial jury without

14. The trial judge stated when considering Jones's motion for acquittal at the close of all the evidence:

> All right. Well, I certainly have seen stronger cases in my lifetime than the one against the Defendant Jones. On the other hand, the evidence is that he was with Mr. Nisbet for some four days, I believe, and he furnished the car to bring them to Indiana; that at least one drug transaction took place while they were in Indiana, $7,000 worth of drugs sold allegedly to a person from Illinois, I believe; that all of these drugs and drug paraphernalia were there in full view. And, in addition to the straight charge or charges contained in the indictment, that he conspired and that he actually possessed the stuff, the Court cannot overlook Title 18, United States Code, Section 2, the aiding and abetting statute, which provides, of course, that anyone who aids or abets another in the performance of a crime may be convicted and punished as a principal. So, whether Mr. Jones was a principal or not, there is evidence I believe from which the jury could find that at the very least he aided and abetted Mr. Nisbet. And so, for that reason, I feel obliged to overrule the motion.

Tr. at 601–02.

15. The judge dismissed the two jurors who made the comments.

having conducted personal oral *voir dire*. We disagree with each contention.

■ Initially, we note that the federal rules permit the trial court to conduct *voir dire* if it allows the lawyers to supplement the examination. Fed.R.Crim.P. 24(a) (1966). Trial judges increasingly have assumed the duty of at least preliminary examination of potential jurors. We believe this procedure promotes efficiency and, in addition, reduces the possibility of prejudicial error. Here the *voir dire* as reflected in the transcript was artfully conducted. Nisbet and Jones had an opportunity to pose additional questions to panel members. That opportunity adequately protected their rights. *United States v. L'Hoste,* 609 F.2d 796, 801–02 (5th Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980).

■ The decision whether to dismiss any or all jurors lies in the sound discretion of the trial judge. On review, we are charged with determining whether manifest injustice resulted from the judge's refusal to dismiss all of the jurors who heard the improper comments noted above. *Irvin v. Dowd,* 366 U.S. 717, 722–24, 81 S.Ct. 1639, 1642–1643, 6 L.Ed.2d 751 (1961). The trial judge in each instance questioned the potential jurors regarding the sensitive areas surrounding the trial, including the facts that drugs were involved and that one or both of the defendants might choose to not testify at trial. Except for the two dismissed panel members, no juror displayed prejudice. Moreover, neither defendant pressed for dismissal of any panel member other than those that eventually were dismissed. We believe that the defendants were tried by an impartial jury.

One final, unusual occurrence deserves attention because Defendant Nisbet argues that it prejudiced the jury against him. During the second day of trial while Nisbet was being escorted to the courtroom, he allegedly encountered a juror while Nisbet was standing outside of an elevator. Nisbet testified that the elevator doors opened, the juror in the elevator saw him, then the doors closed. At the time, Nisbet was shackled to Brett Kimberlin, a defendant in an unrelated case who had received tremendous local publicity. The encounter could not have lasted more than three or four seconds.

Nisbet claimed prejudicial effect and the judge held a hearing outside of the jury's presence to determine any damage. He found none, and refused to allow Nisbet to question the juror, intending instead to rely on a general instruction to disregard such incidents. The trial judge found no evidence of existing or potential prejudice. Moreover, the judge decided that questioning the juror individually would only exacerbate an otherwise harmless event. The general instruction was never given, in part because Nisbet's lawyer himself counselled against it.

The Eighth Circuit in several cases has established that under the circumstances presented here, the defendant bears the burden of showing affirmatively that he was prejudiced by inadvertent exposure to the jurors. *United States v. Carr,* 647 F.2d 867 (8th Cir.1981); *United States v. Robinson,* 645 F.2d 616 (8th Cir.1981); *United States v. Wright,* 564 F.2d 785 (8th Cir. 1977). At least three other circuits, the First, Second, and Fifth, also apply that standard. *United States v. Diecidue,* 603 F.2d 535 (5th Cir.1979), *cert. denied, Gispert v. United States* and *Antone v. United States,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980), *Miller v. United States,* 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980); *United States v. Taylor,* 562 F.2d 1345 (2d Cir.), *cert. denied, Salley v. United States,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977), *Ramsey v. United States, Green v. United States,* and *Wesley v. United States,* 434 U.S. 853, 98 S.Ct. 170, 54 L.Ed.2d 124 (1977); *Dupont v. Hall,* 555 F.2d 15 (1st Cir.1977).

■ We hold that the inadvertent contact here, if any, was not so prejudicial as to require a mistrial. The trial court conducted a hearing in which Nisbet and the marshals escorting him testified in detail about the encounter. The court concluded not only that the juror would not in any

way be prejudiced, but also that it was unlikely that the juror even noticed Nisbet standing outside of the elevator in which she was riding. We are satisfied that the hearing protected Nisbet's right to a fair trial.

### VIII. *Post Trial*

Several minor issues remain on this appeal. First, both defendants urge reversal because the trial judge refused to give several tendered jury instructions. For example, instead of giving a "specific intent" instruction, the court told the jury that the crimes charged require knowing and willful possession or aiding and abetting. The court then defined "knowing" and "willful" in an instruction:

> The word "knowingly" as used in the Indictment means that an act, if any, was done voluntarily and purposely, and not because of a mistake or accident.
>
> The word "willfully" as used in the Indictment means that the act, if any, was committed by a defendant voluntarily, with knowledge that it was prohibited by law, and with the purpose of violating the law, not by mistake, accident or in good faith. However, a defendant who willfully violated the law need not have known the precise law he was violating.

Tr. at 658–59. The committee on jury instructions in this circuit approved that instruction, and we approve it here. The other instructions on the mental elements of these crimes conformed to standards set in *United States v. Garza-Hernandez,* 623 F.2d 496, 501 (7th Cir.1980). *See United States v. Bruscino,* 662 F.2d 450, 461 n. 23 (7th Cir.1981).

The jury also was properly instructed in all other aspects challenged by the defendants.

Second, Defendant Nisbet argues that the trial court abused its discretion in sentencing him. Although Defendant Jones was sentenced to concurrent terms of two years on each narcotics conviction, followed by a special parole term of three years, Nisbet was sentenced to concurrent terms of seven years on the narcotics convictions

plus one consecutive year on the assault charge and a special parole term of three years.

We recognize that sentencing rests within the sound discretion of the trial judge and, if the sentence falls within the limitations set forth in the statute under which it is imposed, this court rarely will disturb the sentence. *United States v. Madison,* 689 F.2d 1300 at 1312 (7th Cir. Sept. 28, 1982) (*citing United States v. Main,* 598 F.2d 1086, 1094 (7th Cir.), *cert. denied,* 444 U.S. 943, 100 S.Ct. 301, 62 L.Ed.2d 311 (1979)). Nisbet contends, however, that the court improperly considered previous criminal charges (for which he was not convicted) and hearsay information when reviewing Nisbet's background. A judge may consider almost any factor when imposing a sentence, including background information. *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 257 (7th Cir.1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976). We have reviewed the transcript of sentencing and find that the trial judge did not rely on any improper information. In *United States v. Harris,* 558 F.2d 366, 371–77 (7th Cir.1977), this court carefully considered the process for determining an appropriate punishment. There we said that considering hearsay was not *per se* improper, and could be allowed if the information was reasonably reliable or not challenged by the appellant. Here, the trial court did not rely on information that was "materially untrue." *See Townsend v. Burke,* 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948). In any event, Nisbet did not discredit any of the information the government offered at sentencing.

### IX. *Conclusion*

We have considered each error alleged by the defendants; the most important allegations are discussed above, the remaining we can dismiss without comment as not meritorious. Accordingly, the judgments are affirmed.

AFFIRMED.