**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John MABRY, Debra Mabry, and Roger Sanders, Defendants-Appellants.**

**Nos. 85–2322, 85–2347 and 85–2377.**

United States Court of Appeals,
Tenth Circuit.

Jan. 20, 1987.

Rehearing Denied March 3, 1987 in
Nos. 85–2322 and 85–2347.

Presiliano A. Torrez (William L. Lutz, U.S. Atty., and Robert J. Gorence, with him on briefs), Asst. U.S. Attys., Albuquerque, N.M., for plaintiff-appellee.

Thomas C. Reeve (George B. Curtis, with him on briefs), of Gibson, Dunn & Crutcher, Denver, Colo., for defendants-appellants John Mabry and Debra Mabry.

Billy R. Blackburn, Albuquerque, N.M., for defendant-appellant Roger Sanders.

Before BARRETT, McKAY and TACHA, Circuit Judges.

BARRETT, Circuit Judge.

John Mabry, his wife, Debra Mabry, and Roger Sanders were jointly tried by jury and convicted of drug related charges. Sentences were entered on September 3, 1985. Each was charged by indictment and found guilty following a five day trial on various counts of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, possession with intent to distribute cocaine and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), and aiding and abetting in violation of 18 U.S.C. § 2. Roger Sanders was charged and convicted of illegal use of a communication facility to facilitate an unlawful cocaine transaction in violation of 21 U.S.C. § 843(b) and (c).

The crucial issues in this case involve the validity of a warrantless entry of a residence, the short "protective sweep" of the house and garage, and the search warrant subsequently obtained.

## FACTS

During the early spring of 1985, the narcotics division of the Albuquerque, New Mexico, Police Department, joined by some state police agents, was pursuing undercover drug investigations designed to arrest the suppliers and sellers of illicit drugs and to confiscate the contraband. This operation was known as "Operation Panama." The operation consisted of several police officers working in undercover capacities, a substantial number of informants and surveillance police officers. (R., Vol. V, pp. 586–89.) The primary purpose of the operation was to seek out people dealing in drugs and arrest them. *Id.* at 589. To this end, Detective Carlos Gonzales (Gonzales) of the Albuquerque Police Department, in his undercover capacity of a cocaine user/purchaser known as Nathan, met appellant Roger Sanders (Sanders), who sold him cocaine. The initial meeting of Gonzales and Sanders took place at an undercover apartment in Albuquerque, where Gonzales purchased one-quarter pound of cocaine from Sanders. The transaction was videotaped. Sanders informed Gonzales that the source of his cocaine was an individual in the Albuquerque area who had a lot of money and who could provide any quantity of high quality cocaine. Gonzales had many subsequent contacts with Sanders, including additional cocaine sale/purchase transactions. During these contacts, Sanders related that his source traveled frequently to Europe.

On March 28, 1985, Gonzales purchased about one ounce of cocaine from Sanders in exchange for $2,100 when they met at Molly's Bar in Tijeras Canyon, about twenty miles from Albuquerque. Gonzales and Sanders discussed Gonzales' wish to purchase one-half pound of cocaine, how the delivery was to be made and how the purchase money was to be transferred. Sanders again stated that he would make contact with his "source" or supplier in Tijeras.

On April 4, 1985, Gonzales and Sanders met at Carrow's Restaurant in Albuquerque where they again discussed the one-half pound cocaine transaction. Sanders, indicating that he needed to speak with his "source," used a pay telephone in the restaurant. Gonzales, who was standing nearby, observed the number Sanders dialed, made a mental note of it, and about noon that day requested that officers in the intelligence division of the department ascertain the name of the telephone subscriber and the address of the number. Officers pursued this request and by 2:00 p.m. had obtained information from Mountain Bell telephone company that the number was

registered to John Mabry, who resided at a particular post office box address in Tijeras Canyon. Two detectives went to Tijeras Canyon that afternoon and photographed the Mabry residence. The photograph was made available to the narcotics division detectives that evening at about 6:00 p.m.

After the meeting at Carrow's Restaurant, Gonzales and another undercover detective, Medrano, met with Sanders at Molly's Bar in Tijeras. Sanders asked them to remain there while he went to arrange the two ounce cocaine transaction with his source. It had been agreed that the purchase price was $16,800. When Sanders returned, it was agreed that the three would meet that evening at 9:00 p.m. at a particular parking lot in the Tijeras Canyon area. At about 7:00 p.m. the evening of April 4, 1985, some ten law enforcement detectives, members of the narcotics division of the Albuquerque Police Department, met at police headquarters to plan their stake-out and surveillance strategy. Detective Gonzales attended and was very much involved in planning the evening contact with Sanders, the stakeouts and surveillance of Sanders. When asked why he did not obtain a search warrant for the Mabry residence before he purchased the two ounces of cocaine from Sanders late the evening of April 4, 1985, Detective Gonzales stated, "I didn't have any probable cause, I didn't know who the connection was or where the house was at." (R., Vol. III, p. 72.) Mr. Gonzales testified that dealers such as Sanders do not want to disclose the location of their sources (suppliers). (R., Vol. V, p. 559.)

Detectives Gonzales and Medrano, in their undercover roles, met Sanders at the designated parking lot in Tijeras about 9:00 p.m. They agreed to follow Sanders to the home of his source. While en route, the detectives lost contact with Sanders' vehicle and returned to the parking lot. When Sanders returned, there was considerable discussion as to how delivery of the half pound of cocaine would be made. The purchase price had been agreed at $16,800 and Gonzales had $8,400 with him. (R., Vol. III, pp. 12, 13.) This money was part of a total sum of $50,000 made available to the Albuquerque Police Department by the City of Albuquerque to investigate drug transactions under a program designated as "Operation Panama."

Upon his return, Sanders informed the officers that his "source" for the cocaine wanted the entire $16,800 fronted, i.e., paid to him prior to delivery of the cocaine to Sanders and that Gonzales and Medrano must wait at the parking lot while Sanders went to get the cocaine. *Id.* at 13, 14. The officers refused to "front" the entire purchase price. After several more meetings—there were four in all—Officer Gonzales handed Sanders $4,200. Sanders was to obtain two ounces of cocaine from his source, return with it to a Chevron gasoline station in Tijeras Canyon, and receive the balance of $12,600 after the officers examined the contents of the two ounces of cocaine and were satisfied with it. *Id.* at 16, 17.

During these trips, Sanders was under surveillance. He was seen driving up to the Mabry house in Tijeras Canyon, entering the home and later departing. After Sanders returned from his "source"—some thirty minutes after he was handed the $4,200—he remarked to Officer Gonzales that his "source" had to "dig up" the cocaine. *Id.* at 18; R., Vol. IV, p. 374. Gonzales opened the package of cocaine, indicated his satisfaction, and after remarking to Detective Medrano that the balance of the money should be given to Sanders, proceeded to arrest Sanders. (R., Vol. III, p. 18.) Officer Gonzales arrested Sanders when the balance of the purchase was handed to him because he did not wish to risk loss of the money and have Sanders returned to the City Jail since Sanders' brother, Dennis, worked there. The officers reasoned that if Sanders was "booked" his source might be notified. Further, Sanders had indicated immediately after his arrest that he had to return "right away" to his source with the rest of the money. Officer Gonzales was aware, from his experience in drug investigations, that if Sanders did not return to his "source"

within five or ten minutes, the source would be suspicious. *Id.* at 19. The officers were not sure that Sanders would go back to his source's house if they permitted him to leave with the $12,600, purportedly to acquire the balance of the cocaine. *Id.* at 20. The officers did not wish to risk the city's money. *Id.* (R., Vol. VII, p. 884.)

About ten officers were involved in the transaction between Gonzales and Sanders on the evening of April 4, 1985. Most of them were conducting surveillance. (R., Vol. III, pp. 111, 112.) These detectives had observed Sanders going to and from the Mabry residence that evening on two occasions, first about 9:00 p.m. and later about 10:30 p.m. *Id.* at 121, 124.

After Sanders was arrested, he was handcuffed and searched. The officers did not find the marked $4,200 in cash previously handed to Sanders. Sanders remarked that he had to return immediately with the $12,600. The officers, experienced in such drug transactions, understood this remark to mean that if Sanders did not return to the home of his "source," Mabry, within a short period of time, incriminating evidence would be destroyed or secreted. (R., Vol. IV, p. 382.) Some six officers, including Gonzales, then proceeded to the Mabry house with Sanders handcuffed in order to "secure" the home and its contents while awaiting a search warrant. *Id.* at pp. 381, 382. Before the officers left to secure the Mabry home, Detectives Cramer and Espinosa had been instructed to return to Albuquerque to obtain a search warrant for the Mabry residence. *Id.* at 376; Vol. III, p. 82. When the officers entered the Mabry home by an open door, they walked into the living room area where John Mabry was watching television and Debra Mabry was asleep. The Mabrys were handcuffed and taken to a kitchen table where they were seated. The officers conducted a "sweep" search of the home and the adjacent garage for weapons and other persons. This activity consumed only a few minutes. *Id.* at 109. After the "sweep," the officers gathered in the living room awaiting the search warrant. *Id.* at 113. The officers had agreed, at the time Sand-

ers was arrested, that they would not search any residents of the Mabry house except for weapons, and that no search would be made of the residence until the search warrant had been issued. (*Id.* at 83, 84.)

The officers entered the Mabry residence at about 11:00 p.m. on the evening of April 4, 1985. The search warrant was delivered at about 2:00 a.m. on April 5, 1985. *Id.* Five detectives conducted the brief security check of the Mabry residence and the garage. *Id.* at 129. Detective Gene Clark went to check the garage. He observed several vehicles in the garage, and wrote down their make and license numbers; for those which did not have license numbers, Clark obtained the VIN serial numbers by observing same on a sticker behind the windshield in plain view. *Id.* at 130.

The information relative to the vehicles and some peat moss, a white powdery substance and a Triple Beam Balance Scale was phoned into the Albuquerque Police Department from the Mabry residence phone by Detectives Clark and Harey. *Id.* at 111. Each of the items called in were in plain view of the officers. *Id.* at 112. The entire "security check" was concluded within a few minutes and nothing was taken into the possession of any of the officers. *Id.* at 112, 113; R., Vol. V, pp. 551, 552. The officers secured the Mabry residence but did not conduct a search until the search warrant arrived. (R., Vol. IV, pp. 382, 383).

When the search warrant was executed and the search conducted, the officers found a substantial amount of cocaine, most of which had been placed outside of the home underneath a rock in heat-sealed "baggies"; some $100,000 in United States currency, German marks and Swiss francs; gold and silver coins, gold bullion, and jewelry; cocaine residue located in a bedroom; about two ounces of cocaine located in Debra Mabry's purse; various drug paraphernalia; and a number of weapons, including two semi-automatic pistols, one of which was loaded, two shotguns, one of which

was loaded, and a semi-automatic rifle. (R., Vol. III, pp. 887–90; 907; 914–17; 926–64.) The $4,200 "buy" money which Officer Gonzales had handed to Sanders in the parking lot was never recovered. *Id.* at 964.

Detective Espinosa, one of the two officers who obtained the search warrant, also served as the inventory or custodial officer during the search process. *Id.* at 968. He testified that a sack of peat moss located near the entry of the Mabry home appeared to be marijuana and was so named in the affidavit for search warrant, *id.* at 975, 976, and that the garage contained a black Corvette, with a license plate, and four Ferrari automobiles, two of which had been partially disassembled. *Id.* at 921–23. In addition, several receipts for the purchase of gold, representing about $73,000, were found outside the home, registered in the name of John Macher, who was identified at trial as John Mabry. (R., Vol. VI, pp. 720–726.)

At the date of trial, Debra Mabry was aged 20, John Mabry was apparently aged 29 and Roger Sanders was aged 24. Debra Mabry testified at the trial. John Mabry and Roger Sanders did not testify. Debra Mabry testified that: she had been addicted to cocaine for four or five years; she had cocaine in her purse when arrested; and she had purchased cocaine from Roger Sanders on various occasions.

## Contentions on Appeal

Appellants John Mabry and Debra Mabry advance the following allegations of error on appeal: (1) the trial court committed reversible error by refusing to suppress evidence seized by government officials as a result of an unconstitutional entry into appellants' home, (2) the trial court abused its discretion by refusing to grant the Mabrys' motions for severance, (3) the trial court abused its discretion by *sua sponte* transferring appellants' trial to the Roswell division of the court, (4) the trial court erred in admitting the co-conspirator evidence concerning statements made by Roger Sanders because the court failed to determine that a conspiracy existed before admitting it, (5) the evidence of appellant Debra Mabry's involvement in the conspiracy and of her intent to distribute cocaine is insufficient to support her conviction, (6) the government did not disclose material, exculpatory evidence requested by appellants, and (7) the admission of character or other crimes evidence against appellant John Mabry constitutes prejudicial error.

Appellant Roger Sanders presents only one issue on appeal. He contends that the trial court committed reversible error by denying his requested jury instruction on entrapment.

### I.

Both before the trial court and on appeal, appellants John Mabry and Debra Mabry contend that the threshold issue is whether the warrantless entry of the Mabry home by the police officers on the evening of April 4, 1985, constituted an unlawful search and seizure under the Fourth Amendment to the United States Constitution.

Appellants John Mabry and Debra Mabry argue that: the police officers created any exigent circumstance that may have arisen when Roger Sanders was arrested by failing to previously obtain a warrant; the failure of the police to attempt to obtain a telephonic warrant and the failure of the trial court to consider the availability of a telephonic warrant mandates reversal; no reasonable apprehension for the safety of the police officers justified the protective sweep of the Mabry residence prior to the arrival of a search warrant; since the search warrant was obtained as a result of the unconstitutional entry and protective sweep of the Mabry residence, all evidence seized by the government should have been suppressed by the trial court; and, the warrant upon which the initial search of the Mabry residence was based was facially invalid.

The Mabrys contend that "the facts in possession of the police at least five hours before the warrantless entry (of the Mabry

residence) would have led any prudent and trained officer to believe that there was a 'fair probability that contraband or evidence of crime' would be found in the Mabry residence. *Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 2088, 80 L.Ed.2d 721 (1984); *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Under the totality of the circumstances of this case, the officers involved had probable cause to search the Mabry residence as early as late afternoon on April 4, 1985, and no later than the strategy meeting at 7:00 p.m." (Brief of Mabry Appellants, pp. 20, 21.)

The Mabrys contend that the police were armed with probable cause and could have and should have proceeded to obtain a search warrant after Officer Gonzales observed Roger Sanders dialing the telephone of John Mabry prior to noon on April 4, 1985. That number was in fact traced to John Mabry and his residence was identified by early afternoon. Photographs of the Mabry home were taken by police officers that afternoon and made available to the "Operation Panama" officers at their 7:00 p.m. strategy meeting.

Officer Gonzales testified that at the time of Sanders' call, presumably to his source, "I didn't have any probable cause, I didn't know who the connection was or where the house was at." (R., Vol. III, p. 72.) We agree. Furthermore, we are persuaded that in keeping with the primary goals of "Operation Panama" and similar drug investigations the most reliable method of "tracking" to the source, i.e., the supplier of drugs, and to the drugs proper is to effect an undercover transaction with the seller, in this case Sanders, in such a manner that the seller will lead the police to both the supplier and the contraband. The nature of the illicit drug business is secretive, suspicious and dangerous.

In the course of the many contacts had with Roger Sanders by undercover Officer Gonzales, Sanders was careful never to identify his source. And even though the police were able to trace the telephone number Sanders called and discovered by Officer Gonzales early on April 4, 1985, as that of John Mabry who resided in Tijeras Canyon, still the police did not know that the Mabry residence was the place where the contraband was kept or delivered by the source, i.e., the Mabrys to the seller, Sanders. The *only* effective manner of ascertaining these facts was by means of undercover, clandestine police activities. First, it was important to the operation to discover and arrest the suppliers of the cocaine being provided Sanders. Second, it was important to confiscate the contraband and its fruits. In the context of this undercover operation, it was perfectly proper that the police not attempt to obtain a search warrant until the source of the cocaine was established to the satisfaction of the officers. This did not come to pass until the surveillance activities of the police had tracked Roger Sanders from the parking lot to the Mabry home, after Sanders had been handed the $4,200 "front" money. In determining the reasonableness of police activities, courts must be sensitive to the nature of police investigations and their public interest goals. In the context of undercover, clandestine drug investigations, courts must be careful not to "second guess" the strategy decisions of experienced, skilled and trained law enforcement officers.

We start with the basic rule that "[s]earches and seizures inside a home without a warrant are presumptively unreasonable" under the Fourth Amendment. *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). This court has recognized an exception to the warrant requirement where the police officers have probable cause to search a home and where exigent circumstances exist. *United States v. Erb,* 596 F.2d 412 (10th Cir.), *cert. denied,* 444 U.S. 848, 100 S.Ct. 97, 62 L.Ed.2d 63 (1979). Here, as in *United States v. Cuaron,* 700 F.2d 582 (10th Cir.1983), a case heavily relied on by the trial court in denying the defendants'-appellants' motions to suppress, there existed both probable cause and exigent cir-

cumstances when the police entered the Mabry home.

The Mabry appellants do not argue that probable cause was lacking at the time of the police officers' entry of the Mabry home. Rather, appellants contend that probable cause existed under "the totality of the circumstances" justifying issuance of a search warrant for the Mabry residence "as early as late afternoon on April 4, 1985, and no later than the strategy meeting at 7:00 p.m." (Brief of Mabry Appellants, pp. 19–21.) On that premise, appellants argue that "police inactivity and disregard of the procedures available to obtain a search warrant cannot justify the warrantless entry into and seizure of a private residence under the guise of exigent circumstances." (Brief of Mabry Appellants, p. 12.) Thus, the Mabry appellants ask this court, just as they did the trial court, to suppress all evidence resulting from the seizures effected as a result of the detailed search of the Mabry residence on April 5, 1985, because of the failure of the police officers to obtain a search warrant prior to the entry of the Mabry home on the late evening of April 4, 1985. We believe that this court, in *United States v. Cuaron, supra,* effectively put this contention to rest.

In *Cuaron* the officers, in a clandestine drug investigation, surveilled the seller's route to his source-supplier's home at about 12:30 p.m. but did not effect any arrests until about 2:00 p.m. The arrests were made concurrent with the delivery of a pound of cocaine. There, as in the instant case, agents immediately began efforts to obtain a search warrant to search the residence of Cuaron, the source/supplier. After about forty minutes following the arrests, the officers determined to secure the Cuaron residence without waiting for the search warrant. Officers entered the Cuaron home at 2:55 p.m. They found Cuaron attempting to flush a substantial amount of white powder, later identified as cocaine, down the toilet. The agents seized the additional cocaine in plain view, detained Cuaron and others in the living room and secured the home until 7:00 p.m. when the search warrant arrived. This court concluded that there was probable cause to believe that cocaine was kept by Cuaron in his home and that exigent circumstances existed justifying the warrantless entry to secure the home until a search warrant was obtained.

■ We observed in *Cuaron* that "[T]he agents had reasonable grounds to believe Cuaron might become alarmed and either destroy the additional cocaine or leave with the cocaine and the $8,000 if Jon did not return in the time necessary to travel to the Boulder Inn, make the transaction, and return to Cuaron's house with the money." 700 F.2d at 590. The same identical concern existed in the case at bar after Roger Sanders was arrested. Thus here, as in *Cuaron,* the officers were armed with probable cause and exigent circumstances existed. The warrantless entry of the Mabry home and the subsequent, limited, "protective sweep" to ascertain whether there were persons other than the Mabrys on the premises who might pose a danger to the officers and to secure the home and the garage, were justified. This circuit and other circuit courts have upheld "protective sweep" warrantless searches based upon probable cause and exigent circumstances. *United States v. Riccio,* 726 F.2d 638 (10th Cir.1984), citing *United States v. Tabor,* 722 F.2d 596 (10th Cir.1983); *United States v. Kolodziej,* 706 F.2d 590 (5th Cir.1983); *United States v. Lyons,* 706 F.2d 321 (D.C. Cir.1983); *United States v. Hatcher,* 680 F.2d 438 (6th Cir.1982); *United States v. Irizarry,* 673 F.2d 554 (1st Cir.1982); *United States v. Gardner,* 627 F.2d 906 (9th Cir.1980); *United States v. Dieu,* 609 F.2d 1038 (2d Cir.1979); and *United States v. Baker,* 577 F.2d 1147 (4th Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978).

In *Cuaron* the contention was advanced, as here, that the police officers effected the arrest of the seller, Jon, at 2:00 p.m. and made no effort to obtain a search warrant based on telephone communications provided for under Rule 41(c), Fed.R.Crim.Proc.

Here, unlike *Cuaron*, the evidence shows that until the time of Sanders arrest, Operation Panama was exclusively conducted by the Albuquerque Police Department. The DEA agents did not become involved, and then only peripherally, until April 5, 1985. The Albuquerque Police officers went to a state district court judge to obtain a search warrant. There were no facilities available in state district court for the acquisition of a telephonic record. The police were also confronted with time constraints. Further, there are no provisions under New Mexico law for a telephonic warrant.

In *Cuaron, supra,* we observed that more than a simple telephone call is required in order to obtain a warrant based upon oral testimony and that time constraints justified the officers proceeding without a warrant:

> The fact that the officers eventually chose to wait until 2:55 p.m. to enter and secure the house does not affect our conclusion regarding exigent circumstances. Where probable cause and exigent circumstances exist, waiting to search does not necessarily remove the exigent circumstances even if the officers may have waited long enough to obtain a warrant. *See [U.S. v.] McEachin,* 670 F.2d [1139] at 1145; *United States v. Johnson,* 561 F.2d 832, 844 (D.C.Cir.) (*en banc*), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1977). Of course we do not here hold that the presence of exigent circumstances obviates the need for a warrant in any subsequent search, no matter how long delayed. We hold only that under these facts a warrantless search was justified even though the agents did not search Cuaron's house until about fifty-five minutes after the Neets' arrest.

700 F.2d at 590.

The facts supporting the warrantless entry of the *Cuaron* home are closely analogous to those in this case. In both cases the police had probable cause, as a result of surveillance of the seller, to believe that a particular home was the source of the cocaine obtained for sale and that government "front" money had been delivered to the occupants. Further, in both cases experience had taught that if the sellers did not return to the residence of the source within a short period of time, the supplier would either proceed to destroy the cocaine on the premises and secret the cash or depart the premises with the cocaine and the cash.

We agree with the oral findings/conclusions of the trial court in denying the motions to suppress evidence obtained as a result of the search conducted on April 5, 1983:

> It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.

> However, a warrantless entry for some limited purpose is permissible if police officers have probable cause to search the residence and exigent circumstances are present.

> And I think this case has already been addressed by the Tenth Circuit in *United States v. Cuaron,* 700 F.2d 582 (1983).

> The Government has the burden of establishing that exigent circumstances had made the warrantless entry necessary. And it is up to the Court to evaluate the circumstances as they appeared to prudent and cautious and trained officers.

> And here the Court finds that there did exist sufficient evidence or probable cause to believe that there was some drug activity originating at the residence of the defendant.

> In order to verify this, efforts were made to follow Mr. Sanders to the residence, and although there seems to have been some problem effecting that, it did come to pass.

> However, the officers in this case, and properly so, were attempting to seek a search warrant before going on the premises.

> According to the information that they had, as the evidence shows, Mr. Sanders had a brother that was employed at the Bernalillo County Detention Center, and

that the arrest of Mr. Sanders, and that if he were to be taken to the detention center, might have alerted the brother, who ... while it is not clear, but it was possible that he might in turn have alerted the source of Mr. Sanders' cocaine.

So the Court finds that it was reasonable for the officers to believe that it was important that they imminently go to the residence and secure the premises for fear that through the circumstances and also the fact that Mr. Sanders had not returned for the subsequent purchase of the additional amount of cocaine, might have alerted the defendant Mabry, and that they could and probably would have disposed of the cocaine that at least the officers believed to be on the premises.

So the Court finds that given the circumstances, it was reasonable and prudent for the officers to enter and secure the house as they did.

(R., Vol. III, pp. 183–185.)

The trial court further found that the officers did not conduct a search of the residence and garage until the search warrant arrived. Further, the court found that certain evidence was in the plain view of the officers while awaiting the arrival of the search warrant, i.e., a balance beam and some white, powdery residue, that would not be suppressed. The trial court reserved ruling on the manner in which the officers had obtained the VIN numbers from certain vehicles located in the garage area. *Id.* at 186. The Government did not offer in evidence either the suspected bag of marijuana (the peat moss) or the automobiles seized in the garage. However, reference to the vehicles was made by counsel for the Mabrys on cross-examination. (R., Vol. VII, pp. 922, 923.) The only item observed by the officers during the initial entry described in the affidavit for search warrant which was later introduced in evidence by the government was the triple-beam balance scale. This item was observed by the officers in plain view in the kitchen area during the "protective sweep" of the Mabry home.

In the affidavit, the officers stated that, in addition to the triple-beam balance scale, they had observed a suspected bag of marijuana (later identified as peat moss) and certain vehicles identified by VIN and license numbers which could be used to secret drugs or to transport them. Appellants contend that because the initial entry and "protective sweep" of the Mabry home was violative of the Fourth Amendment, *all* of the evidence seized by the government under the authority of the search warrant should have been suppressed by the trial court because its seizure was connected with the initial taint, citing to *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). We have already upheld the initial entry and the "protective sweep" search. Furthermore, we have observed that only the triple-beam balance scale was introduced in evidence by the Government at trial. That, then, would seem to reduce the issue as to whether references in the affidavit in support of the search warrant relative to the vehicles in the Mabry garage and the suspected marijuana were such as to taint and render the search warrant invalid under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

The references to the vehicles and the suspected marijuana were certainly not deliberately false or made in reckless disregard of the truth as condemned in *Franks v. Delaware*. Furthermore, these references, measured in the context of the entire affidavit, did not invalidate the warrant, inasmuch as there are sufficient accurate statements of fact in the affidavit in support of its issuance. *See United States v. Riccio, supra.*

Probable cause in this case was not in anyway dependent on the state district court judge's knowledge of the presence of the vehicles in the garage or the suspected marijuana. This seems to have been conceded by the Mabry appellants. They have insisted that probable cause existed for the issuance of a search warrant of their home at least as late as 7:00 p.m. on April 4, 1985. The duty of the appellate court is to

ensure that the issuing judge or magistrate had a substantial basis for concluding that there was probable cause. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). We hold that there was probable cause to support the issuance of the warrant in this case.

■ Finally, the Mabry appellants, relying on *Steele v. United States,* 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925), challenge the validity of the search warrant for failure to reasonably identify the place to be searched. The Mabrys point to the description of their home set forth in the affidavit, i.e., "SC P.O. Box 30, Tijeras, New Mexico, a single family dwelling, frame and brown stucco," and contend that the search warrant is void on its face. The Mabrys do not point out, however, that attached to the search warrant was a photograph of the Mabry home which was made a part thereof. The canyon area where the Mabry home is located makes it difficult to verbally identify particular homes. Here, a police officer testified that he could locate the Mabry home by means of the description in the warrant, together with the photograph. We hold that this *meets the test of description* of the Mabry home with sufficient particularity to enable an executing officer to locate and identify it with reasonable effort. *See also, United States v. McCain,* 677 F.2d 657, 660 (8th Cir.1982); *United States v. DePugh,* 452 F.2d 915 (10th Cir.1971), *cert. denied,* 407 U.S. 920, 92 S.Ct. 2452, 32 L.Ed.2d 805 (1972).

## II.

The Mabrys contend that the trial court erred and abused its discretion by refusing to grant their motions for severance. Those motions were anchored to affidavits executed by Roger Sanders wherein Sanders stated that if he were called to testify on behalf of John Mabry or Debra Mabry at a separate trial or trials, he would testify and offer material, exculpatory evidence relative to the source and ownership of the cocaine which would establish that the cocaine did not come from the Mabrys.

After the motions for severance were reviewed, counsel for Debra Mabry stated that if severance was granted, Roger Sanders would be called to testify in her behalf and "[W]hether or not his counsel will allow him to testify or not, we will see." (R., Vol. VIII, p. 1207.) Thereupon, the Government's counsel, upon invitation of the court, stated "[Y]our Honor, this is the first that we heard that he (Roger Sanders) would invoke the Fifth at this trial. It was our understanding that in separate trials he would take the stand. If, in fact, the trials were tried separately we would still be facing the same—the use of his testimony against him. So if he's going to take, the Fifth Amendment, I don't see how that fits in with the severance. And there hasn't been any showing, either by affidavit specifically as required under the Rule to establish what particular exculpatory information he would provide to establish this." *Id.* Thereafter the trial court re-affirmed its prior ruling denying the motions for severance on the ground that the movants had not made the showing required under Rule 14, Fed.R.Crim.Proc. *Id.*

Counsel for defendant Debra Mabry then made this offer of proof: "[T]hat Mr. Sanders would testify that the cocaine that was found on the property of John Mabry was cocaine that belonged solely to Mr. Sanders. That Mr. Mabry had nothing to do with that cocaine of any nature whatsoever. That he, himself, planted the cocaine in that area for the reason he felt he did not want to divulge to the person he was dealing with, Mr. Nathan, that—of his actual position and holdings of cocaine, and as a result of that, he created the myth or the position that he would direct the attention of Mr. Nathan to others and all the time it would be his own source." *Id.* at 1298, 1299.

■ In determining the merits of a motion for severance, the court must weigh the prejudice to a particular defendant caused by the joinder against the important considerations of economy and expedition in judicial administration. *United States v.*

*Walton,* 552 F.2d 1354 (10th Cir.), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977). Severance is a matter of discretion, not of right, and the defendant bears a heavy burden of demonstrating prejudice to his case. *United States v. Parnell,* 581 F.2d 1374 (10th Cir.1978), *cert. denied,* 439 U.S. 1476, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979). The trial court's decision denying a motion for severance will not be disturbed on appeal in the absence of an abuse of discretion. *United States v. Butler,* 494 F.2d 1246 (10th Cir.1974).

In *United States v. McConnell,* 749 F.2d 1441, 1445 (10th Cir.1984), this court set forth the factors to be considered when a defendant moves for severance upon a claim that he needs the testimony of a co-defendant:

> 1) the likelihood that the co-defendant would in fact testify at the movant's severed trial and waive his Fifth Amendment privilege; 2) the significance of the testimony in relation to the defendant's theory of defense; 3) the exculpatory nature and effect of such testimony; 4) the likelihood that the co-defendant's testimony would be impeached; 5) the extent of prejudice caused by the absence of the testimony; 6) the effect of a severance on judicial administration and economy; 7) the timeliness of the motion.

In *McConnell, supra,* this court concluded that the codefendant's testimony would be significant in McConnell's theory of defense and that it would be exculpatory. But, since it lacked substance, no abuse of discretion was found.

 Here, as in *McConnell,* co-defendant Roger Sanders' proffered testimony lacked substance.

Debra Mabry's testimony was that Roger Sanders was the sole source of the cocaine and that she and John Mabry had nothing to do with it, except as users. The jury apparently discounted this testimony perhaps in consideration of the presence of numerous items of drug paraphernalia, currency, silver and gold bullion and cocaine found during the search. The most telling evidence of John Mabry's possession of co-

caine with intent to distribute was the testimony that his thumb print was traced to one of the fourteen packets of cocaine seized in plastic bags buried behind the Mabry garage, wrapped in aluminum foil. (R., Vol. VII, pp. 955, 956.) At the same location, the agents found some precious metals, Krugerrands and $35,000. *Id.* This location had been pointed out by John Mabry as the place where he buried his gold, silver and currency. *Id.* Further, an expert testified that the packet of cocaine found on Roger Sanders' person when he was arrested was consistent with the plastic packages contained in the Seal-A-Meal found in the Mabry home. The jury had heard testimony of the earlier conversations between officer Gonzales and Roger Sanders beginning on March 15, 1985, relative to Sanders' source residing in the Tijeras Canyon area. The cumulative evidence established that the Mabrys were the source of the cocaine supplied to Sanders and that the Mabry residence was the point of distribution of the cocaine. Accordingly here, as in *McConnell,* Sanders' proffered testimony lacked substance.

Debra Mabry testified that Roger Sanders was the source of the cocaine and that she and her husband, John, were users only. The jury obviously rejected this testimony as lacking credibility. Further, had Roger Sanders testified that he alone was responsible for the cocaine found at the Mabry residence, such would have been effectively impeached by Sanders' prior inconsistent statements, i.e., that Sanders' "source" resided in the Tijeras Canyon area and traveled to Germany. (R., Vol. III, pp. 13–18, 71.)

 The Mabrys also argue that severance was appropriate because of the disparate amount of evidence that would have been introduced against co-defendant Sanders. Such is a proper basis for severance only in the most extreme cases, and this is not such a case. *Compare, United States v. Jones,* 707 F.2d 1169 (10th Cir.1983), *cert. denied,* 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983). The fact that evidence

against one defendant is more incriminating than another is not, standing alone, a basis for severance, *United States v. Dill,* 693 F.2d 1012 (10th Cir.1982), nor is severance required because a defendant might have a better chance of acquittal if trials had been severed. *United States v. Petersen,* 611 F.2d 1313 (10th Cir.), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1979).

The trial court did not abuse its discretion in denying the motions for severance. No actual prejudice resulted from the denial of the motions.

### III.

The Mabrys argue that the trial court abused its discretion by *sua sponte* transferring the trial of this case from the Albuquerque division of the court to the Roswell division of the court.

Appellants imply, perhaps inadvertently, that there is more than *one* district in the State of New Mexico, both in the phrasing of this issue and in the following quote of Rule 18, Fed.R.Crim.Proc.:

> Except as otherwise permitted by statute or these rules, the prosecution shall be had in a *district* in which the offense was committed. The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice. (Brief of Mabry Appellants, pp. 34, 35.)

The district court, *sua sponte,* transferred the trial of this case from the Albuquerque division of the District of New Mexico to the Roswell division of the District of New Mexico following the filing of a motion by counsel for defendant John Mabry for individual *voir dire* of the jurors relative to pretrial publicity in the Albuquerque, New Mexico, area. The trial court properly interpreted this motion as one of concern as to whether a fair trial could be had in Albuquerque. Appellants objected to the transfer.

 Fixing the place of trial within a district, as here, is a matter within the discretion of the trial court. That discretion must be upheld unless we find that it was abused. *United States v. Lawson,* 670 F.2d 923 (10th Cir.1982). The trial judge interpreted the motion for individual *voir dire* as serious concern about a fair trial in the Albuquerque division of the district because of pre-trial publicity. The court's concern was valid. There was no substantial inconvenience to the defendants or the witnesses as a result of the transfer and no real prejudice has been demonstrated.

We hold that the trial court did not abuse its discretion by transferring the trial of the defendants-appellants from the Albuquerque division to the Roswell division of the court. *United States v. Raineri,* 670 F.2d 702 (7th Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982); *United States v. Burns,* 662 F.2d 1378 (11th Cir.1981); *United States v. Young,* 618 F.2d 1281 (8th Cir.) *cert. denied,* 449 U.S. 844, 101 S.Ct. 126, 66 L.Ed.2d 52 (1980).

### IV.

The Mabry appellants argue that the "coconspirator" evidence concerning statements made by Roger Sanders should have been excluded, since the trial court failed to determine that a conspiracy existed before admitting it.

Appellants contend that the trial court failed to follow the preferred order of proof mandated by *United States v. Andrews,* 585 F.2d 961 (10th Cir.1978), reaffirmed with further guidance in *United States v. Petersen,* 611 F.2d 1313 (10th Cir.1979), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980). In *Andrews,* we held that the trial court, in the prosecution of a conspiracy case, must, under Rule 104 of the Fed.Rules of Evid., determine, prior to the admission of a hearsay statement of a coconspirator, that the Government has shown by independent evidence that it is more likely than not that the conspiracy existed, that the declarants and the defendants against whom the conspirator's statement is offered were mem-

bers of the conspiracy, and that the statement was made during the course and in furtherance of the objects of the conspiracy. In *Petersen* we suggested that the preferred procedure regarding the admissibility of a co-conspirator's hearsay statements would be that the trial court make the determination, based on substantial independent evidence, during the Government's case in chief. Further, we suggested that whenever possible, the Government should present its independent evidence of the conspiracy and the defendant's connection therewith before the hearsay declarations of a co-conspirator are admitted.

In the instant case, the trial court was aware of our decisions and the above rules. (*See*, R., Vol. IX, p. 1411.) The Mabry defendants had filed a motion *in limine* to require the Government to establish a prima facie case of conspiracy independent of a co-conspirator's hearsay statements. The trial court, acknowledging its understanding of the preferable procedure, ruled that the Government could proceed to present its case subject to appropriate rulings by the court at appropriate times if the evidence warrants. (R., Vol. IV, pp. 206, 207.) The trial court made the requisite findings at the close of the Government's case in chief. (R., Vol. VIII, p. 1203.) At the close of all of the evidence, in order to comply with *Petersen*, the court again found by a preponderance of the evidence, independent of the statements of Roger Sanders, "[n]umber one, that a conspiracy existed; number two, that the statements of Mr. Sanders and the defendants Mabry against whom the statements were offered were members of the conspiracy; and three, that the statements attributed to Mr. Sanders were made during the course and in furtherance of the conspiracy." (R., Vol. IX, p. 1425.)

██ The Government's first witness was Detective Gonzales. He testified in great detail relative to Operation Panama, his undercover contacts with Roger Sanders, the activities leading to the arrest of Sanders in Tijeras Canyon, and the police entry and subsequent search of the Mabry home and garage. Gonzales testified about purchases of cocaine he made from Roger Sanders on March 20, March 28, and April 3, 1985. Several recorded phone conversations and one video involving Gonzales and Sanders were placed in evidence. During these encounters, Sanders did not identify his source, i.e., the Mabrys, but he did state that the source of his cocaine resided in Tijeras Canyon, traveled to Europe and owned fancy Ferrari automobiles which Sanders had driven. This evidence established the existence of a conspiracy.

On April 4, 1985, Detective Gonzales, during the meeting with Roger Sanders at the restaurant, observed the telephone number dialed by Sanders purportedly to his "source" which was later that day traced to the residence of John Mabry in Tijeras Canyon, New Mexico. Finally, as a result of surveillance, Roger Sanders was tracked from the parking lot meeting place in Tijeras Canyon to the residence of his source, John Mabry. This evidence and corroborating testimony of Detective Medrano, who worked closely with Gonzales in an undercover capacity, did serve to establish the independent proof required under Andrews, *supra.*

██ The trial court carefully reviewed the independent evidence, fully cognizant of *Andrews, Petersen* and *United States v. Stipe*, 653 F.2d 446 (10th Cir.1981). The court found that there was sufficient independent evidence presented by the Government to prove the existence of the conspiracy and that when the Sanders' statements were made, there was ample evidence that Sanders and John Mabry were members of the conspiracy to distribute cocaine and, finally, that the Sanders hearsay statements were made during the course of the conspiracy. The court found that it was not reasonably practical for the Government to put on proof of the existence of the conspiracy by independent evidence and that it was necessary to permit the hearsay statements to come in subject to being connected up. (R., Vol. VIII, p. 1203). We hold that the trial court did not err. *United States v. Harenberg*, 732 F.2d 1507

(10th Cir.1984); *United States v. Pilling*, 721 F.2d 286 (10th Cir.1983); *United States v. Calabrese*, 645 F.2d 1379 (10th Cir.) *cert. denied*, 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1981).

Roger Sanders had, prior to April 4, 1985, informed Officer Gonzales that his "source" was a male, drove sports cars, traveled to Germany and lived in Tijeras Canyon. (R., Vol. IV, pp. 301, 347; R., Vol. V, pp. 481–82; R., Vol. IX, pp. 1450–53.) These statements fit the hearsay exception described in Fed.R.Evid., Rule 801(d)(2)(E), i.e., statements made by a co-conspirator during the course and in furtherance of the conspiracy. At no time did Roger Sanders use the Mabrys names. The "tie-in" occurred when Sanders was surveilled going to the Mabry residence to acquire the cocaine on the evening of April 4, 1985.

We hold that a review of the record supports the trial court's findings that the Government did present adequate independent evidence during its case in chief proving, the existence of the cocaine distribution conspiracy and the Mabry's involvement therein, i.e., as the "source" or "supplier" to the "seller," Roger Sanders. The record discloses: (1) discovery of the Mabry telephone number as that of the "source" of cocaine to be sold by Sanders and subsequent police investigation which led to the identification of the Mabry home in Tijeras Canyon, (2) after the contact was made between Officer Gonzales and Roger Sanders on the evening of April 4, 1985, police officers followed Sanders' pickup vehicle to the Mabry residence, (3) after Sanders left the Mabry residence, he returned to the meeting place with Gonzales where he delivered the cocaine to Gonzales, and (4) the testimony of a chemist identified the thumbprint of John Mabry on one of the bags of cocaine admitted into evidence, which had a common origin with the cocaine delivered by Sanders to Gonzales. As far as Debra Mabry is concerned, the trial court pointed to the fact that weapons were found in the Mabry home, together with large sums of money, coupled with Mrs. Mabry's possession of cocaine. The court pointed to other evidence establishing a sufficient nexus from which the jury could reasonably infer that she and her husband were members of the conspiracy. *Id.* at 1205–06. We agree.

We also observe that notwithstanding the Mabrys' allegations that Sanders' statements should have been excluded because the court failed to determine that a conspiracy existed before admitting it, the Mabry appellants have also urged that we hold that the original entry by the police of the Mabry home and the subsequent search-seizure following issuance of the search warrant were illegal because the police were armed with probable cause to search the Mabry residence at least by 7:00 p.m. on April 4, 1985.

## V.

The Mabry appellants contend that there is insufficient evidence in this record establishing Debra Mabry's involvement in the conspiracy and of her intent to distribute cocaine. They argue that her conviction should be set aside.

Debra Mabry was convicted on three counts involving charges of conspiracy to distribute cocaine, possession with intent to distribute cocaine and aiding and abetting in the distribution of cocaine.

In effect, Debra Mabry urges this court to view her role as simply that of a possessor or user of cocaine who had no control over any activities at the Mabry home. We hold that the circumstantial evidence and reasonable inferences to be drawn therefrom are such that the jury was justified in finding Debra Mabry guilty beyond a reasonable doubt.

Her testimony that Roger Sanders' contact with the Mabry residence was simply that of a supplier of cocaine for her needs does not stand up against the evidence. The jury could and did reasonably find that Debra Mabry knew of and participated in the criminal conspiracy to possess with intent to distribute cocaine.

The evidence found at the Mabry residence consisted, in part, of a Seal-A-Meal

used to package the cocaine, a triple-beam scale used to weigh the cocaine, two shotguns, two semi-automatic pistols, a semiautomatic rifle, a bowl and spoon with cocaine found in the kitchen near the Seal-A-Meal, $1,400 in cash in Debra Mabry's purse and about an ounce of cocaine, silver and gold bullion, $100,000 in United States currency, Swiss and German currency and some Manitol, purchased by Debra Mabry, which was used to cut the cocaine in the various transactions charged in the indictment. (R., Vol. VIII, pp. 1056–76.) The Government's expert testified that the percentage of cocaine and Manitol used to cut the cocaine in Government Exhibits 1, 4, 7 and 18, identified as cocaine distributed in the distributions charged in the indictment, shared a common origin. (*Id.* at 1076–77.) The Seal-A-Meal was found to have been used to seal the two ounces of cocaine delivered by Roger Sanders to Officer Gonzales after Sanders left the Mabry home and returned to his meeting place nearby. Significantly, a search of Roger Sanders' apartment following his arrest did not produce any items for distribution of substantial quantities of cocaine.

The trial court did submit a simple possession instruction to the jury in accord with the defense presented by Debra Mabry. (R., Vol. IX, p. 1521.)

Debra Mabry testified that she was a cocaine user, that the cocaine found in her purse was for her personal use and, in effect, any cocaine on the Mabry premises could be attributed to her use. Her testimony placed her credibility before the jury and the jury found that her account was not credible. Credibility determinations are reserved for the jurors who hear the testimony, consider evidence, and evaluate the demeanor of the witness. *United States v. Valentine,* 706 F.2d 282 (10th Cir.1983).

We hold that there was sufficient evidence, direct and circumstantial, to support the jury's verdict of Debra Mabry's guilt in participating in the criminal conspiracy to possess with intent to distribute cocaine.

## VI. and VII.

Appellants contend that the Government failed to comply with the disclosure requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to disclose prior to trial that Roger Sanders urinated in his pants at the time of his arrest. There is nothing in this record showing that there was any police report reflecting this fact or that it was known to the Government prior to trial. This evidence became known to the Government during trial and it was related to Roger Sanders' counsel prior to jury deliberations. The only testimony about the matter was that of Dennis Sanders, brother of Roger Sanders, who was also under arrest and placed in a cell with Roger Sanders on the morning of April 5, 1985. He testified that Roger Sanders removed a "baggie" from his crotch area, remarked that it was "cut" and flushed it down the toilet. (R., Vol. IX, pp. 1301–1304.) The Government presented evidence that there are no toilets in the "holding area" Roger Sanders was placed. *Id.* at 1420, 1421.

The Mabrys argue that this evidence is clearly exculpatory because the bag containing "cut" would have been the substance used by Roger Sanders to dilute cocaine for distribution and the fact that it was on his person shows that Roger Sanders was "his own source." (Brief of Appellants, pp. 53, 54.)

 The Government's evidence was that Roger Sanders was thoroughly searched when he was arrested. Found on his person were a small weighing scale, some white powder in baggies later identified as cocaine, and three dollars in United States currency. (R., Vol. IV, pp. 377–381.) There was no police report containing evidence that Sanders had urinated on himself at the time of his arrest. There is no evidence that the Government withheld this evidence from the defense. Furthermore, this evidence does not meet the test of materiality set forth in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), i.e., that had the evi-

dence been disclosed to the defense, there was a reasonable probability that the result of the proceeding would have been different. The *Bagley* court described the "reasonable probability" as one which would "undermine confidence in the outcome." 105 S.Ct. at 3384.

■ Appellants further contend that the trial court erred in admitting the testimony of one Richard Tucek, a commissioned precious metals broker, who testified that John Mabry had purchased quantities of gold and silver of the value of some $73,000 from him under a fictitious name. (R., Vol. VI, pp. 708–33.) Mabry contends that admitting this testimony involving the "assumed name" transactions put John Mabry's character in issue, notwithstanding that John Mabry did not testify, all in violation of Federal Rules of Evidence, 608 or 609 and that it should have been excluded under Federal Rules of Evidence 404(b). (Brief of Appellants, p. 55.)

The Government's position, accepted by the trial court, was that the large amount of gold and silver found during the search of the Mabry residence was the equivalent of a large amount of unexplained cash, which has been held to be probative of state of mind and intent in the context of a narcotics distribution scheme. *United States v. Bernal,* 719 F.2d 1475 (9th Cir. 1983); *United States v. Tramunti,* 513 F.2d 1087 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). We agree.

The trial court did not abuse its discretion in admitting the testimony of Mr. Tucek.

## VIII.

Appellant Roger Sanders argues that the trial court committed reversible error by denying his requested instruction on entrapment. Specifically, Sanders complains that at the close of the evidence presented by co-defendants John Mabry and Debra Mabry, the court made the following ruling after counsel for Sanders had tendered to the court a requested jury instruction on entrapment:

All right; well, you can tender it, Mr. Blackburn. I'm sure you understand under the law that before any entrapment instruction can be given, the witness must take the stand and he must admit all the essential elements of the offense. And Mr. Sanders, not having testified—there's no basis upon which the Court could entertain giving such an instruction.

(R., Vol. IX, pp. 1428, 1429.)

Roger Sanders argues that the trial court erred in ruling that it was necessary that he testify in order to be entitled to an entrapment instruction. He contends, relying on *United States v. Henry,* 749 F.2d 203 (5th Cir.1984) and other cases cited, that a defendant is not required to testify or to concede guilt in order to pursue the entrapment theory if there is sufficient evidence of inducement and predisposition in the record, independent of the testimony of the defendant, to raise an entrapment issue.

In *United States v. Worth,* 505 F.2d 1206 (10th Cir.1974), *cert. denied,* 420 U.S. 964, 95 S.Ct. 1358, 43 L.Ed.2d 443 (1975), this court held that testimony from an accused is not prerequisite to his reliance upon the defense of entrapment and stated:

Of course, in the absence of such testimony the defense of entrapment may not sufficiently appear as to warrant submission of the issue to the jury. And as in the case of any other defense premised significantly upon state of mind, failure of the accused to take the stand may or may not leave other prima facie evidence unconvincing or insufficient to raise a reasonable doubt of guilt. Such practical consequences, contrary to appellant's contention, cannot be considered to render appearance of the accused as a witness involuntary.

505 F.2d at 1209, 1210.

■ The trial court in the instant case rejected the tendered instruction on entrapment at the close of all of the evidence *except* Roger Sanders' defense evidence.

The trial court determined at that stage that there was no evidence to support an entrapment instruction. On that premise, the trial court observed that before an entrapment instruction could be given, Roger Sanders must take the stand, admit the essential elements of the offense, and by his testimony raise the entrapment issue to a jury question. We agree.

In *United States v. Gurule*, 522 F.2d 20 (10th Cir.1975), *cert. denied*, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976), we held that in determining whether entrapment has been established, there must be undisputed evidence showing that an innocent defendant was induced to commit a crime by the trickery or fraud of a government agent. There is no such evidence in this record. There is nothing indicating that Roger Sanders was an innocent dupe and that Officer Gonzales was the motivating force in bringing about the violations of the law. To the contrary, the evidence shows that· Roger Sanders was active in cocaine distribution dealings. Officer Gonzales, in his undercover capacity, simply provided Sanders with the opportunity to violate the law. *See United States v. Barron*, 594 F.2d 1345 (10th Cir.), *cert. denied*, 441 U.S. 951, 99 S.Ct. 2180, 60 L.Ed.2d 1056 (1979).

The government points out that Roger Sanders may have qualified for the entrapment instruction under *Worth, supra*, if his counsel had clearly admitted, in his opening statement or closing argument, both of which were waived, all of the elements of the crime with which he was charged. (Brief of appellee, pp. 44, 45.) We agree. In *United States v. Mora*, 768 F.2d 1197 (10th Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 856, 88 L.Ed.2d 895 (1986), we held:

We realize that the circuit courts of appeal are divided over whether defendants must admit all the elements of a crime before they can assert the entrapment defense. We need not review the intricate permutations of each circuit's rule here, however, because this case is controlled by our previous *en banc* decision in *Munroe v. United States*, 424 F.2d 243, 244 (10th Cir.1970). In *Munroe* defendants did not deny engaging in sales of drugs, but they did deny the requisite mental state by contending that the sales were legal. This court held that they were not entitled to an entrapment instruction when they admitted all of the elements of the crime except the mental state.

768 F.2d at 1198, 1199.

The record is barren of any admission by Roger Sanders of the elements of the crimes of conspiracy to distribute cocaine, possession of cocaine with intent to distribute same and use of a telephone to facilitate the possession of cocaine with intent to distribute. The trial court made it clear that Roger Sanders must, before an entrapment instruction could be given, admit all of the essential elements of the offense. He. elected not to do so. The trial court did not err in refusing to submit the requested entrapment instruction to the jury.

WE AFFIRM.

McKAY, Circuit Judge, dissenting:

The court correctly quotes the Mabrys' chief contention on this appeal:

The Mabrys contend that "the facts in possession of the police at least five hours before the warrantless entry (of the Mabry residence) would have led any prudent and trained officer to believe that there was a 'fair probability that contraband or evidence of crime' would be found in the Mabry residence. *Massachusetts v. Upton*, 466 U.S. 727, 104 S.Ct. 2085, 2088 [80 L.Ed.2d 721] (1984); *Illinois v. Gates*, 462 U.S. 213 [103 S.Ct. 2317, 76 L.Ed.2d 527] (1983). Under the totality of the circumstances of this case, the officers involved had probable cause to search the Mabry residence as early as late afternoon on April 4, 1985, and no later than the strategy meeting at 7:00 p.m."

Maj. op. at 676–77 (quoting Brief for Mabry Appellants at 20–21). The Mabrys argue that exigent circumstances at the time of John Sanders' arrest cannot excuse failure to se-

cure a search warrant when police officers could have obtained, or at least initiated the process to obtain, a warrant long before the arrest.

The court fails, however, to squarely confront this contention, instead stating, "We believe that this court, in *United States v. Cuaron*, [700 F.2d 582 (10th Cir.1983),] effectively put this contention to rest." Maj. op. at 678. Because *Cuaron* is not dispositive of this case and because the court's opinion gives carte blanche to law enforcement officers, who quite commonly and routinely engage in operations such as this one to apprehend those involved in drug trafficking, to deliberately frustrate the warrant requirement in all such operations by relying on the exigent circumstances that predictably and inexorably arise at the time of the middleman's arrest, I must respectfully dissent.

## I.

The time pattern of the events of April 4, 1985, is critical to the Mabrys' argument. On several occasions during the preceding month, undercover police officers purchased various amounts of cocaine from Roger Sanders, who alluded to his source as living in Tijeras Canyon near Albuquerque, New Mexico. Officers wished to identify and arrest this source and to seize Mr. Sanders' supply. Consequently, undercover officer Gonzales met with Roger Sanders in a restaurant in Albuquerque on the morning of April 4, 1985, to arrange for the purchase of one-half pound of cocaine that evening. After Mr. Sanders stated that he needed to speak with his source, officer Gonzales observed him dial a telephone number. By 2:00 p.m. that afternoon, the officers knew that (1) the number was registered to John Mabry, and (2) Mr. Mabry's post office box listed his residence as located in Tijeras Canyon. The officers made no attempt to secure a search warrant at this time.

During the afternoon of April 4, 1985, two detectives surveilled the Mabry residence and took several photographs, one of which was later attached to the affidavit

for the search warrant eventually obtained. These photographs were made available to the officers involved by 6:00 p.m. Still, no attempt was made to procure a search warrant.

At 7:00 p.m., the officers met to plan strategy for the evening's operations. The Mabrys' brief recites the facts known to the police at this time:

1) Roger Sanders intended to sell them one half [sic] pound of cocaine that evening;

2) Roger Sanders had called his alleged source from a restaurant in Albuquerque;

3) Roger Sanders had referred to one of his sources as a man who lived in Tijeras Canyon, New Mexico;

4) The phone number Sanders dialed when trying to reach his source was listed under the name of John Mabry;

5) The Mabry residence was located in Tijeras Canyon;

6) The exact location of the Mabry residence;

7) An exact description, through police photographs, of the Mabry residence;

8) Roger Sanders had repeatedly and regularly supplied undercover officers with cocaine;

9) Sanders had previously been followed driving up Tijeras Canyon; and

10) The Mabry residence would be a target of the evening's operations.

Brief for Mabry Appellants at 8–9. The officers still did not pursue a search warrant for the Mabry residence.

Undercover detectives met with Mr. Sanders at approximately 9:00 p.m., after which time the latter made several trips to his source's house. "During these trips, Sanders was under surveillance. He was seen driving up to the Mabry house in Tijeras Canyon, entering the home and later departing." Maj. op. at 674. "[The] detectives had observed Sanders going to and from the Mabry residence that evening on two occasions, first about 9:00 p.m. and later about 10:30 p.m." Maj. op. at 675. Although these observations confirmed

that the photographed residence did, indeed, belong to the source, still no attempt was made to even initiate proceedings to obtain a search warrant.

After returning from the 10:30 p.m. trip to the Mabry residence and delivering a quantity of cocaine to undercover officers, Roger Sanders was arrested at approximately 11:07 p.m. Because the Mabrys expected Mr. Sanders' return, the officers decided the circumstances were sufficiently exigent to justify a forceable entry of the Mabry residence without a warrant in order to "secure" it prior to the arrival of a search warrant. Two officers were finally dispatched to Albuquerque to begin the process of obtaining a search warrant between 11:15 and 11:30 p.m.

At approximately 11:30 p.m., five officers entered the Mabry home without consent, handcuffed John and Debra Mabry, and proceeded to make a "protective sweep" throughout both the house and a detached, locked garage located approximately thirty yards from the residence.[1] Upon entry into the living room, the officers found John Mabry watching television and Debra Mabry asleep. During the course of the "protective sweep," license plate numbers and vehicle identification numbers (VINs) of four automobiles found in the garage, two of which were partially disassembled, were copied down. This information, as well as other information obtained in the "protective sweep," was relayed to the officers in Albuquerque and used in the preparation of the affidavit for the search warrant. The officers arrived back at the Mabry residence with the issued search warrant at approximately 2:00 a.m., two and one-half hours after being dispatched.

## II.

"It is, of course, an elementary constitutional principle that police officers must go before a neutral government official and obtain a search warrant before intruding into a private dwelling." *United States v. Scheffer*, 463 F.2d 567, 574 (5th Cir.), *cert.*

*denied*, 409 U.S. 984, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972); *see also Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (warrantless searches inside a home held presumptively unreasonable). Only in "exceptional circumstances" does an exemption lie, and the burden is on the prosecution to demonstrate that the Government's warrantless search or seizure comes within an exemption. *United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951). Moreover, in this circuit, the Government's burden is seen as a heavy one. *United States v. Coker*, 599 F.2d 950, 950–51 (10th Cir.1979).

The well-recognized exception invoked in this case is that of "exigent circumstances." The police feared that when Roger Sanders failed to return after his arrest, the Mabrys would become suspicious and proceed to destroy incriminating evidence. "When officers have reason to believe that criminal evidence may be destroyed or removed before a warrant can be obtained, the circumstances are considered sufficiently critical to permit officers to enter a private residence in order to secure the evidence while a warrant is sought." *Cuaron*, 700 F.2d at 586 (citations omitted). However, part of the equation in determining whether the exigent circumstances exception will excuse the absence of a warrant is whether there was sufficient opportunity before the exigency arose to obtain a warrant. "Exigent circumstances alone ... are insufficient as the government must also show that a warrant could not have been obtained in time." *United States v. Good*, 780 F.2d 773, 775 (9th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 1523, 89 L.Ed.2d 920 (1986). If the officers "passed up a reasonable opportunity to have obtained a warrant ... their failure to seek the approval of a detached judicial officer cannot be excused." *United States v. Robertson*, 606 F.2d 853, 859 (9th Cir. 1979).

---

1. The record shows that the officers had to obtain an automatic garage door opener from Mr. Mabry in order to open the garage. Record, vol. 7, at 921.

In this case, the Government failed to satisfy its heavy burden in this respect. It offered no plausible explanation for the failure to attempt to obtain a warrant earlier in the afternoon or evening, particularly considering that

> the possible imminent destruction of the cocaine would have been created by an arrest that [the officers] should have known would be necessary. This scenario would suggest that the government created the exigent circumstances on which it now relies in attempting to justify the search. If the government in fact created the exigent circumstances, then those circumstances cannot justify the entry into [the defendants'] home.

*United States v. Thompson,* 700 F.2d 944, 951 (5th Cir.1983); *see also United States v. Morgan,* 743 F.2d 1158, 1163 (6th Cir.) (police not free to create exigent circumstances to justify their warrantless intrusions), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1984); *United States v. Dowell,* 724 F.2d 599, 602 (7th Cir.) ("law enforcement officials may not deliberately wait for exigent circumstances to arise and then exploit the exception to justify warrantless entry"), *cert. denied,* 466 U.S. 906, 104 S.Ct. 1683, 80 L.Ed.2d 157, *cert. denied,* 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984); *United States v. Hultgren,* 713 F.2d 79, 86 (5th Cir.1983) ("warrantless search may not be justified on the basis of exigent circumstances which are created by the government itself").

I concur in the position taken by the Sixth Circuit:

> Where law enforcement officers have squandered an overt opportunity to obtain a warrant antecedent to an otherwise acceptable search (justified by exigent circumstances or incident to a valid arrest), there must be a showing of compelling "countervailing factors" to sustain the constitutionality of the suspect intrusion. *Niro v. United States,* [388 F.2d 535, 539 (1st Cir.1968)]. We are persuaded that this view is not foreclosed by the Supreme Court's holding in *Cardwell v. Lewis,* [417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974)]. We believe that, if a defendant's allegation of deliberate bypass of a warrant is supported by a finding that a realistic opportunity existed to procure one, as in this case, the Government must come forward with *objective* evidence tending to justify this deviation from normal police procedure. Subjective good faith on the part of the authorities cannot suffice as a complete defense if we are to honor the principle that warrantless searches are per se unreasonable under the Fourth Amendment.

*United States v. Chuke,* 554 F.2d 260, 263–64 (6th Cir.1977) (emphasis in original). I do not maintain that a search warrant must always be obtained at "the first practicable moment." *Cardwell,* 417 U.S. at 595, 94 S.Ct. at 2471. However, a definite factor to consider when evaluating whether exigent circumstances justify a warrantless search is whether there was a prior "realistic opportunity" to secure a warrant. Absent "compelling countervailing factors" and adequate "objective evidence" to satisfy the Government's burden of justifying the failure to obtain a warrant when it had a reasonable opportunity, I would not absolve the divergence from the constitutional requirement of procuring a search warrant before entering a private residence.

The only testimony in the record with respect to why the officers made no attempt to obtain a search warrant earlier in the evening was a statement by Officer Gonzales: "I didn't have any probable cause, I didn't know who the connection was or where the house was at." Record, vol. 3, at 72.[2] While I take issue with the

---

**2.** The majority mischaracterizes this testimony as a response to a question concerning why no warrant was pursued after officers observed Mr. Sanders' telephone call to his source. Maj. op. at 677. In actuality, this statement was in response to the following question: "Now, why didn't you get a search warrant before you purchased this two ounces of cocaine from Mr. Sanders on the night of April 4th?" Record, vol. 3, at 72. This distinction is significant for, while there may not have been probable cause at 2:00 p.m. when the phone number was traced

assertion that there was no probable cause before 11:30 p.m. when a warrant was finally pursued, I must first assert that it is *not* the function of the officer to make the determination of probable cause. "A law enforcement officer is only justified in making his own probable cause determinations when there are exigent circumstances." *United States v. Alberts,* 721 F.2d 636, 639 n. 3 (8th Cir.1983); *see also Steagald v. United States,* 451 U.S. at 214 n. 7, 101 S.Ct. at 1648 n. 7, 68 L.Ed.2d 38 (1981) ("absent exigent circumstances the magistrate, rather than the police officer, must make the decision that probable cause exists"). There were *no* exigent circumstances at 2:00, 6:00, 7:00, 9:00 or 10:30—all times when probable cause arguably arose.

The integrity of the fourth amendment depends on the independent evaluation of probable cause by a neutral and detached magistrate. Otherwise, the very person whose behavior is meant to be circumscribed by the warrant requirement determines whether a warrant should issue. The Supreme Court discussed this crucial point in *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948):

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.... When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

*Id.* at 13–14, 68 S.Ct. at 368–69 (footnotes omitted).

Just as the affirmative existence of probable cause is not to be determined by police officers absent exigent circumstances, neither is the lack thereof to be determined by them. This is particularly so when there is a subsequent warrantless entry, and the Government then attempts to justify the absence of a warrant through arguing the prior lack of probable cause—even though it never submitted the matter to a magistrate for such a determination. The rise of the telephonic warrant is due in part in response to just these concerns.[3] If at all

---

to John Mabry, there certainly was when Roger Sanders was observed entering and leaving the Mabry residence at 9:00 p.m.—if not much earlier at 6:00 p.m. when photographs of the Mabry residence were made available to the officers.

This mischaracterization by the court is consistent with its misconceived statement that "[t]he Mabrys contend that the police were armed with probable cause and could have and should have proceeded to obtain a search warrant after Officer Gonzales observed Roger Sanders dialing the telephone [sic] of John Mabry prior to noon on April 4, 1985." Maj. op. at 677. As the quotation from their brief at the beginning of this dissent indicates, the Mabrys argue only that probable cause was clear "at least five hours before the warrantless entry" at 11:30 p.m. Their brief concentrates in large part on the activities of the early evening of April 4, 1985.

**3.** Because only "a federal law enforcement officer or an attorney for the government" can request a warrant under Fed.R.Crim.P. 41, a telephonic warrant pursuant to Rule 41(c)(2) was unfortunately unavailable in this case. Operation Panama was conducted exclusively by the Albuquerque Police Department.

The chief purpose behind the rule providing for telephonic warrants is "to encourage police to procure telephone warrants" when they might otherwise conduct a warrantless search. *Cuaron,* 700 F.2d at 588. Consistent with this purpose, five circuits have imposed a burden on the Government in the federal context when attempting to justify a warrantless search to demonstrate that a telephonic warrant could not have been obtained. *See Good,* 780 F.2d at 775; *United States v. Manfredi,* 722 F.2d 519, 522 (9th Cir.1983); *United States v. Berick,* 710 F.2d 1035, 1038–39 (5th Cir.), *cert. denied,* 464 U.S. 899, 104 S.Ct. 255, 78 L.Ed.2d 241, *cert. denied,* 464 U.S. 918, 104 S.Ct. 286, 78 L.Ed.2d 263 (1983); *Cuaron,* 700 F.2d at 589; *United States v. Jones,* 696 F.2d 479, 487–88 (7th Cir.1982),

possible, the matter should be submitted to a magistrate, no matter how inconvenient that may be. Convenience, after all, is not the touchstone of fourth amendment analysis. "Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government...." *Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919, 944, 103 S.Ct. 2764, 2780, 77 L.Ed.2d 317 (1983).

In stating that "courts must be careful not to 'second guess' the strategy decisions of experienced, skilled and trained law enforcement officers," maj. op. at 677, the court implies that the decision to refrain from pursuing a warrant earlier in the evening was nothing more than a "strategy decision," because the timing of the warrant is all that is at issue—not the manner in which the officers executed their plan of action. With all due respect, that implication proves too much. The decision whether to comply with the constitutional mandate of prior recourse to a neutral magistrate before entering a private home is much more than a mere "strategy decision." It is a decision of constitutional dimensions and must be closely scrutinized by this court. Moreover, the effectiveness and success of the officers' operations that evening were in no way dependent upon delay in obtaining the search warrant until 11:30 p.m. as opposed to 6:00 or 7:00 or 9:00 or 10:30 p.m. Their operation would not have been affected in any manner. They still may have chosen to wait until Roger Sanders' arrest at 11:07 p.m. to enter the Mabry home with the search warrant.

Furthermore, that there existed prior to 11:30 p.m. a "fair probability that contraband or evidence of a crime," *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332, could be found in the Mabry residence cannot seriously be challenged. If not sooner, the police clearly had probable cause at 9:00 p.m. when they first observed Roger Sanders enter and leave, in the middle of the drug sale, the very residence that they expected housed the source. The court states that "the police did not know that the Mabry residence was the place where the contraband was kept or delivered by the source, i.e., the Mabrys to the seller, Sanders." Maj. op. at 677. First, the police need not "know"; they need only have probable cause. Surely the court is not suggesting that it is proper to quash a search warrant issued prior to definitively "knowing" that contraband can be found. The conscious choice to wait for certainty cannot excuse a later warrantless entry which ensues because of that choice, particularly when the arrest of the middleman and the concomitant rise of exigent circumstances is foreseeable. Second, and more important, all such uncertainty was dispelled when they observed Mr. Sanders enter and leave the residence during the drug purchase transaction. Even if the officers had waited until this point to dispatch the officer for a traditional warrant, the officers would have likely had the warrant in hand when they entered the Mabry residence at 11:30 p.m., for the record shows that it took approximately two and one-half

*cert. denied*, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983); *United States v. McEachin*, 670 F.2d 1139, 1147 (D.C.Cir.1981); *cf. Steagald*, 451 U.S. at 222, 101 S.Ct. at 1652 ("if a magistrate is not nearby, a telephonic search warrant can usually be obtained"). Furthermore, they have not tolerated evasion of the requirement by simply accepting the Government's pleas of "a general policy to avoid using telephonic search warrants." *Jones*, 696 F.2d at 487; *see also Cuaron*, 700 F.2d at 590 (failure to obtain telephonic warrant merely because not looked upon favorably will not be excused).

Until individual states take the progressive step exemplified by the federal rule providing for telephonic warrants, state law enforcement officers have the option of contacting a federal law enforcement officer or government attorney who, in turn, can request a telephonic warrant from a federal magistrate. *See United States v. Johnson*, 641 F.2d 652 (9th Cir.1980) (telephonic warrant upheld where San Diego police officer contacted Assistant United States Attorney who then contacted United States Magistrate to request telephonic search warrant). The present case would have lent itself well to such a procedure, because DEA authorities, while not actively participating in the operation until after the arrests, were notified of it beforehand. Record, vol. 5, at 587. They could easily have been consulted as the federal intermediary in requesting a telephonic search warrant from a federal magistrate.

hours to obtain the warrant once the process was finally initiated.

The police investigation and staged narcotic sale involved in this case are everyday occurrences in police precincts across the nation. In an effort to protect Government funds earmarked for these operations, the middleman is usually arrested, as in this case, prior to entrusting him with the total amount of "buy money"—and prior to his expected return to his source. The middleman's arrest in these schemes is, therefore, a foreseeable event which will likely raise exigent circumstances at the situs of the source in light of the middleman's expected return. In some operations, the location of the source may be unknown until shortly before the arrest and the accompanying rise of exigent circumstances. Such is *not* the case here. When sufficient probable cause that the contraband can be found in a known location exists hours before the inevitable arrest, officers have no excuse for not having a warrant in hand when the arrest transpires and prompt entry becomes imperative to preserve the evidence. In short, the Government fails in this case to satisfy its heavy burden of showing, as a legitimate and necessary part of the exigent circumstances inquiry, any compelling "countervailing factors" to excuse its "unexplained neglect to obtain a warrant" before Roger Sanders' arrest. *Niro*, 388 F.2d at 538.

The majority relies heavily on this court's opinion in *United States v. Cuaron* in dismissing the Mabrys' contention that a warrant should have been pursued prior to Roger Sanders' arrest. Its reliance is misplaced.

In that case, in a drug operation similar to the case at bar, the officers first observed the middleman drive up to the source's residence at 12:30 p.m. The middleman was arrested shortly before 2:00 p.m. and efforts were then initiated to obtain a search warrant. Approximately forty minutes later, because the source expected the middleman's return, the officers decided to secure his residence without waiting for a search warrant. The search

warrant arrived approximately four hours later. *Cuaron*, 700 F.2d at 585.

The chief contention there on appeal was that the situation at the time of the arrest did not amount to exigent circumstances. The source contended that the police had no objective basis to believe that destruction of criminal evidence was imminent. Alternatively, he argued that in any event the police had sufficient time *after the middleman's arrest* to obtain a telephonic warrant pursuant to Fed.R.Crim.P. 41(c)(2).

In finding exigent circumstances and upholding the validity of the warrantless entry, the court focused *entirely* on the span of time between the arrest and the warrantless entry. The court found that "[a]t the time of [the middleman's] arrest, the officers could not count on even thirty minutes to obtain a telephone warrant because it had taken [the middleman] less time than that to return to [the source's] house after completing the first transaction." *Cuaron*, 700 F.2d at 590. No argument was either made by the parties or addressed by the court that there was sufficient probable cause far enough in advance of the *arrest* that a warrant should have been pursued prior to that time. Indeed, the time sequence in that case would have made such an argument tenuous at best. The source's house was first identified a little more than one hour before the middleman's arrest. This is in marked contrast to this case in which there was a nine-hour time span between first knowing John Mabry's address and Roger Sanders' arrest. Notwithstanding the majority's characterization, the issue in this case is one of first impression. In failing to recognize that, the court unjustifiably extends *Cuaron* beyond its intended boundaries by infusing it with an interpretation not contemplated by the *Cuaron* court.

The majority opinion in this case, as well as the district court's opinion quoted at length therein, focuses only on the exigency which arose "after Roger Sanders was arrested," maj. op. at 678, thus, ignoring the prior ample opportunity to attempt to obtain a warrant. Such a narrow focus

was justifiable, even necessary, in *Cuaron* where the facts simply did not present the issue raised in this case. To rely on *Cuaron* here, however, in disposing of the Mabrys' argument is to summarily dismiss without adequate reasoning a constitutional contention not addressed in *Cuaron*.

### III.

I also question the constitutionality of the putative "protective sweep" ostensibly undertaken for the officers' safety. First, no court has held that a protective sweep can be routinely undertaken in all justifiable warrantless entries. The officers must "reasonably believe that there might be other persons on the premises who could pose some danger to them." *United States v. Riccio*, 726 F.2d 638, 641 (10th Cir.1984) (officers heard several shots fired from different places in the residence). "[P]rotective sweeps are appropriate only where officers reasonably perceive an immediate danger to their safety." *United States v. Owens*, 782 F.2d 146, 151 (10th Cir.1986). Moreover, vague claims of fear for safety are not sufficient to justify departure from the usual requirement of a warrant. The officers "must be able to 'point to specific and articulable facts' supporting their belief that other dangerous persons may be in the building or elsewhere on the premises." *United States v. Whitten*, 706 F.2d 1000, 1014 (9th Cir.1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984). This court has said that "the suspicion of danger must be *clear* and *reasonable* in light of all surrounding circumstances." *United States v. Tabor*, 722 F.2d 596, 598 (10th Cir.1983) (emphasis added); *see also Morgan*, 743 F.2d at 1163 (Government must show "serious and demonstrable potentiality for danger"). Second, even if that burden is satisfied, "[a]

protective sweep is not a thorough search. It is merely a quick and cursory viewing to check for other persons who might present a security risk." *Owens*, 782 F.2d at 151.

Both of these limitations to a constitutional protective sweep were transgressed in this case. The police had no reason to believe that there were other persons in the Mabry residence who could pose some danger to them. Unlike in *Cuaron*, none of the officers testified that anyone was observed other than Roger Sanders entering or leaving the Mabry residence while it was under surveillance or that anyone other than the Mabrys was believed to be in the house.[4] The record in this case is completely void of *any* objective facts or articulable expression by the police officers that the sweep was undertaken because they feared for their safety. Even the exigent circumstance prompting the initial entry was fear of the destruction of incriminating evidence rather than fear for anyone's safety. "[T]he situation confronting the officers when they entered the Mabry residence was completely innocuous and did not pose any threat to the officers' safety; John Mabry was sitting in a chair watching TV and his pregnant wife Debra was lying on the floor sleeping." Brief for Mabry Appellants at 26–27.

Even more egregious was the so-called protective sweep of the detached garage. The building was a full thirty yards away from the house. The officers did not observe anyone entering or leaving the garage during the entire evening of surveillance. The fact that the police had to obtain an electric garage door opener from John Mabry to enter it illuminates the absurdity of claiming that the garage was searched because the officers possessed articulable facts leading them to reasonably fear that someone dangerous to their safety was secreted there.

---

4. Testimony quoted in the *Cuaron* opinion affirmed that *"people were starting to leave the house,* leave the residence, there were some comings and goings there." *Cuaron*, 700 F.2d at 587 (emphasis in original). Moreover, the opinion quotes the testimony of one officer which verifies that he knew of at least one person other than the source in the residence: "Yes, sir, we knew that, at least one subject was in the residence. Mr. Van Omen had entered and not exited that residence." *Id.*

The court's approval of this "protective sweep" without requiring any objective showing of both suspicion of the presence of others and fear for safety abolishes, in effect, such prerequisites and legitimates so-called "protective sweeps" *anytime* a residence is lawfully entered, even if only to prevent the destruction of evidence while awaiting a warrant. *No* court, including this one, has blanketly condoned such warrantless sweeps without the requisite showing of objective facts reasonably supporting an inference that there is a threat to the officers' safety. The burden is not a heavy one, but it must be met.

Furthermore, the officers clearly exceeded the scope of a lawful protective sweep when they went so far as to copy down license plate numbers and VINs of four vehicles found in the garage. A protective sweep is a limited search for persons, not things. Even if the officers could have conducted a protective sweep, their activity went beyond legitimately securing the area. Many of us judges would have to don our eyeglasses to be able to even *read* VINs. The so-called "protective sweep" was, in fact, nothing more than a smoke-screen for an unconstitutional warrantless search. Attaching an attractive, but self-serving, label to police activity does not cure the defect. Moreover, in the long run, it undermines and discredits this important exception whose purpose is to protect the safety of the officers. I would not jeopardize that vital purpose by approving the prostitution of the rule.

### IV.

With respect to Roger Sanders' requested entrapment instruction, the court affirmed the district court's ruling that, to be entitled to such an instruction, the defendant, or the defendant's attorney in the opening statement or the closing argument, must admit "all of the elements of the crime with which he was charged." Maj. op. at 688. I continue to adhere to my view expressed in my dissenting opinion in *United States v. Badger*, Nos. 78–1935 & 78–1936, slip op. (10th Cir. March 4, 1980),

*cert. denied,* 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980). Specifically, since the defense of entrapment is essentially a claim that the Government supplied the criminal intent, I would not require an admission of that element of the crime.